Charlie F. WADE et al., Plaintiffs,
and
United States of America et al.,
Plaintiff-Intervenors,

v.

MISSISSIPPI COOPERATIVE EXTEN-
SION SERVICE et al., Defendants.

No. EC 70–29–K.

United States District Court,
N. D. Mississippi, E. D.

Feb. 15, 1974.

Frank R. Parker, Jackson, Miss., Stephen P. Passek, Mary Planty, Dept. of Justice, Washington, D. C., for plaintiffs.

William A. Allain, Charles A. Marx, Asst. Atty. Gens., Jackson, Miss., Fred B. Smith, Ripley, Miss., Pat M. Barrett, Lexington, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This action was instituted on April 29, 1970, as a class action for declaratory and injunctive relief to eliminate state-wide racial segregation and discrimination in the employment and promotion practices of Mississippi Cooperative Extension Service (MCES), and also to eliminate discriminatory practices in the public services and activities provided by the organization.[1]

The named plaintiffs, all black residents of Mississippi, are three professional employees of MCES, Charlie F. Wade, LaVerne Y. Lindsey and Athaniel H. Moody; the minor children of Ms. Lindsey and the minor children of Ms. Odell Durham, as 4–H club members; Ms. Odell Durham, a home demonstration club member; and Howard T. Bailey, a farmer. Plaintiffs represent classes consisting of: (a) all black employees or prospective employees of MCES; (b) all black youths who are members of segregated 4–H clubs in Mississippi, or 4–H clubs in the state which practice racial discrimination; and (c) all members of segregated home demonstration groups in Mississippi.[2]

The United States on October 29, 1971, was allowed to intervene in the action upon the certificate of the Attorney General that the cause was of general importance pursuant to 42 U.S.C. § 2000h–2.[3] Clifford M. Harding, Secretary of Agriculture, and Lloyd H. Davis, Administrator of Federal Extension Service, originally included as defendants in the

---

1. Federal court jurisdiction exists under 28 U.S.C. §§ 1331(a) and 1343(3) on claims arising under 42 U.S.C. §§ 1981, 1982 and 1983; 42 U.S.C. § 2000d et seq.; and the Fourteenth Amendment to the United States Constitution.

2. The court in September 1970 entered a class action order which defined plaintiffs' classes as above and allowed Bailey to prosecute the action as an individual but not as a class for all black farmers in Mississippi.

3. 42 U.S.C. § 2000h–2.
 "Whenever an action has been commenced in any court of United States seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin, the Attorney General for or in the name of the United States may intervene in such action upon timely application if the Attorney General certifies that the case is of general public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action."

action, were subsequently realigned on the side of the United States. This action came after the court refused to allow the private plaintiffs to voluntarily dismiss the federal officers who had previously filed answers denying the charges of racial segregation and discrimination; instead of dismissal, their realignment as plaintiffs was ordered.

The defendants are MCES, a federally-funded state agency; its director, Dr. William M. Bost; Mississippi State University (MSU), the land-grant college in Mississippi designated to receive state and federal funds for MCES' operations; its president, Dr. William L. Giles; the Board of Trustees of the Institutions of Higher Learning; its president and executive secretary; and members of the Board of Supervisors of Holmes County, Mississippi.[4] By their answers, defendants denied all essential averments of the original and amended complaints and the complaint in intervention.

After extensive discovery, the parties filed a lengthy stipulation of uncontradicted facts. Voluminous evidence, consisting of oral testimony, depositions and documentary exhibits, was submitted to the court initially on plaintiffs' motion for preliminary injunction, and then on final hearing. Plaintiffs' motion for preliminary injunction, renewed at the last evidentiary hearing, was denied without prejudice.[5] On the basis of the stipulation and evidence adduced, the court finds the essential facts to be as follows:

## I. FINDINGS OF FACT

### A. *General*

1. MSU is designated by the Mississippi Legislature as the land-grant college to receive state and federal funds for the operation of a cooperative extension service throughout the state; and MCES, as a division of MSU, directly administers the Mississippi extension program. The purpose of cooperative extension work, as set forth in the Smith-Lever Act of May 8, 1914 (7 U.S.C. § 341 et seq.), is to aid in "diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same." By this statute, to qualify for receipt of portions of the federal funds for extension work, matching funds must be provided by the State of Mississippi. Also, all 82 counties in the state contribute funds to operate and maintain the extension service. The funds so provided for these purposes are approximately 50% federal, 30% state and 20% county funds.

2. The philosophy of the extension service is to help people help themselves in obtaining a higher level of living and a more satisfying and abundant life. To accomplish these aims, a cooperative arrangement has existed between the United States Department of Agriculture (USDA), which provides national leadership and supervises the expenditure of federal and state-matching funds, and MSU, which executes through MCES an approved program of work. The authority for this relationship derives from formal documents setting forth the several understandings between USDA and MSU, which have been periodically revised.[6] All actions and procedures of MCES affecting personnel and plans of work were routinely approved by USDA until the Department of Justice intervened in this

---

4. The action sought to make as class defendants all other boards of supervisors in the state, but this was denied by the court's September 1970 order.

5. By agreement of the parties, a portion of plaintiffs' complaint alleging that defendants unconstitutionally maintain two land-grant colleges in Mississippi, MSU and Alcorn A & M College, as part of a dual segregated system of higher education, has been ordered deferred to a future date.

6. The 1968 memorandum of understanding provides as follows:

"[T]hat all state and county personnel appointed by the Department as cooperative agents for extension work in agriculture and home economics in the State of Mississippi shall be joint representatives of the Mississippi State University and the United States Department of Agriculture, unless otherwise expressly provided in the project agreement.

 \* \* \* \* \*

action. The MCES programs are essentially educational in nature and are of great social and economic importance to the citizens of the state. These programs fall into four general categories: agriculture, home economics, 4–H youth development, and community or resource development. Extension workers, employed in varying numbers in different counties, carry out specific programs designed for local needs under the supervision and direction of district and state office personnel.

3. The executive head of MCES is its director, Dr. Bost, who has held that position since 1962. The director is, in turn, responsible to President Giles, who is subject to the directions of the Board of Trustees of the Institutions of Higher Learning. Director Bost has the direct responsibility for staff organization, selection, assignment, promotion, and transfer of personnel, preparation and presentation of budget requests, overall program development and development of policies relating to employment. In addition to hiring state, district and area personnel, the director recommends to the county boards of supervisors the employment of county extension workers (Miss. Code § 2964), and his recommendations, which are subject to the approval of USDA, are customarily accepted by the supervisors.

B. *Employment Policies and Practices*

4. As of July 1, 1972, MCES personnel consisted of more than 1000 employees, divided into five basic groups: (a) professional state staff; (b) professional district staff; (c) professional area agent staff; (d) professional county staff; and (e) nonprofessional aides and clerical employees.

5. As of July 1, 1972, 464 persons, including 68 blacks, were employed in various professional positions.[7] State super-

"[T]hat the annual plans of work for use of Smith-Lever and other Federal funds in support of Cooperative Extension work shall be made by the Cooperative Extension Service of the State of Mississippi and shall be subject to the approval of the Secretary of Agriculture in accordance with the terms of the Smith-Lever Act as amended or other applicable laws . . . ."

7. MCES professional roster is tabulated as follows:

| Position | Black | White | Total |
|---|---|---|---|
| State staff | 1 | 4 | 5 |
| State specialists | 5 | 70 | 75 |
| Area specialists | 0 | 11 | 11 |
| Area agents | 14 | 11 | 25 |
| District agents | 0 | 4 | 4 |
| District program leaders | 0 | 8 | 8 |
| County agents * | 0 | 82 | 82 |
| Extension home economists | 3 | 79 | 82 |
| 4–H youth agents | 8 | 109 | 117 |
| Associate county agents | 16 | 15 | 31 |
| Assistant county agents | 2 | 2 | 4 |
| Associate home economists | 12 | 0 | 12 |
| Assistant home economists | 7 | 1 | 8 |
| | 68 | 396 | 464 |

\* The position of county leader is ordinarily filled by the same person who serves as county agent.

visory personnel and state specialists with statewide responsibilities in various subject-matter fields are located at MSU, except for 3 black specialists who are stationed at Alcorn A & M College (Alcorn), a predominantly black college. The area specialists in different fields of knowledge have responsibilities limited to

specific geographic areas of the state, and they supervise area agents who work in their subject-matter areas within a territory usually embracing several counties. The administration of the extension program is further divided geographically into four districts, each comprising 20 or 21 counties. The district agent, who is directly under the director, promotes the extension programs within the counties of his district, serves as liaison between the MCES director and the MCES county personnel, and also directs the efforts of male and female district program leaders. The county professionals customarily consist of (a) the county leader who has the overall county program responsibilities as well as administrative and supervisory responsibility over other employees; (b) the county agent (male) who almost always serves as county leader; (c) an extension home economist (female); and (d) one or more 4–H youth agents (male and female) who currently have responsibility equal to that of the county agent or extension home economists. In some counties there are assistant or associate county agents and home economists. At the present time the minimum educational requirement for state and area specialists is a master's degree, with a doctor's degree preferred, and for county professional workers a bachelor's degree, with a master's degree preferred. Advanced degrees are held by 20% of the black and 37% of the white professionals.

6. Besides the professional staff, MCES' personnel consists of 146 clerical employees and 430 nonprofessional aides. Of this number, 10 clerks and 359 aides are black. No formal educational requirements exist as to these positions. The great majority of the black aides work in the Expanded Food and Nutrition Education Program, a project which is 100% federally funded and serves a predominantly black clientele.

7. Prior to January 1, 1965, MCES operated a racially dual organization composed of a white extension service staffed by white persons and a similarly structured but separate service staffed mainly by black personnel. Each branch of workers was housed in separate offices and primarily served a clientele of its same race. The Negro branch, with separate headquarters at Jackson, had maintained Negro county extension offices in 56 of the state's 82 counties, staffed wholly by black personnel,[8] responsible to black state leaders in charge of Negro work; these leaders reported to the MCES director. While a certain degree of internal reorganization began in 1963, the significant changes occurred two years later. In 1965, the titles of all Negro county agents were changed to associate county agents, with no change made in the titles of the white county agents; the titles of all Negro home demonstration agents were changed to associate extension home economists, and the titles of all white home demonstration agents were changed to extension home economists. The title of W. E. Ammons, state leader of Negro work, was changed to Special Assistant, a position never refilled after Ammons' retirement. Similarly, the titles of two Negro district home demonstration agents were changed to assistant district leaders, home economics program. Title changes were also made for blacks who served as 4–H agents for Negro boys and girls. After the merger, the former Negro county agent, Negro home demonstration agents and other black professionals occupied the same offices as the white staff and were responsible to the white county agents and white extension home economists, their former job counterparts under the dual system. The black professionals in most cases no longer had supervisory authority over subordinate professional workers, and in some counties they continued to serve a predominantly black clientele. No blacks were assigned to work in counties previously staffed by only white extension personnel.

8. No black professionals at time of merger were offered the position of coun-

---

8. This included 35 Negro county agents and 54 Negro county home demonstration agents.

ty agent or extension home economists, the top male and female county office positions. Beginning in 1966 black agents received a series of salary increases designed to equalize their compensation with that of white professionals having comparable jobs and qualifications. As for the black professionals who had exercised supervisory responsibility over other workers and had a broad range of extension work, these changes were viewed as demotions, yet other blacks did not regard themselves demoted by the merger. MCES supervisory personnel did not adopt and apply nondiscriminatory and objective criteria, such as degree, tenure, and years of service, in reassigning extension workers in the merged organization. USDA, however, interposed no objection to the merged organization.

9. From 1965 to 1970, 87 persons were appointed to the positions of county agent and extension home economists. In every instance the one appointed was a white person. Director Bost defended this result by what he regarded as a racially nondiscriminatory hiring and promotional policy based upon five criteria, viz: (a) degree held; (b) length of service; (c) technical knowledge; (d) job performance; and (e) concept of job applied for. During this period of time vacancies were filled without prior announcement upon the director's determination, after consultation with the district agent and other concerned professionals. The holder of a master's degree, where other things were equal, was preferred over that of a bachelor's. Length of service was measured by the duration of MCES employment. Technical knowledge was determined by test scores on examinations given professional workers following in-service training sessions periodically conducted by MCES supervisory personnel. Job performance was determined by evaluation scores on a comprehensive evaluation instrument developed for all workers by MCES and USDA and separately graded by the district agent and his program leaders. The concept of job applied for was based upon what MCES supervisory personnel concluded the worker's understanding to be. No fixed ratio, or precise weight, was established for the use of the five criteria, each person eligible for promotion being considered upon a combination of all five factors. The director and other state personnel conceded that there were black employees qualified to be county agents or extension home economists, some with equal or more experience and with equal or more education than that held by white appointees; a practical obstacle to their appointment during this interval of time was the announced or known opposition of some county supervisors because of race.

10. In January 1970, the director instituted a procedure of announcing all staff vacancies to extension workers and affording all qualified personnel an opportunity to apply for openings. This announcement procedure, at first district-wide, became statewide for all professional employees in 1972.[9] A total of 89 county professional vacancies have since been announced, for which 124 applications were made by extension workers. Of these applicants, 14 were blacks, six of whom were selected and recommended to the county supervisors. Of the 110 white extension workers applying, 10 were selected and so recommended. A total of 59 positions were filled by whites outside MCES, while 14 positions remained vacant as of July 1973, without MCES applicants. Several vacancies occur each year in the positions of county agent and extension home economists; at least 28 persons have been promoted to these positions since the announcement procedure was instituted. All appointees have been of the white race except for 2 black extension home economists and one black county agent who were promoted to these positions subsequent to

9. The announcement procedure does not obtain in at least three classes of vacancies: (1) state specialists at Alcorn; (2) area specialists and (3) reassignments due to reduction in staff.

July 1, 1972. No whites applied for the two home economist positions, and the single black county agent was appointed one week before trial.

11. At the time of merger, the MCES professional staff consisted of 409 whites and 106 blacks. By July 1972 there were 38 fewer black agents, or a reduction of 34%, and 13 fewer whites, or a 3% decline. However, the total number of MCES employees of both races, including nonprofessionals, continually increased to date of trial. For example, at merger date, total white personnel were 615, and are now 691; total black personnel were then 139, and are now 450. Thus, of MCES's total present employees, 62% are white and 38% are black, which parallels the state's 1970 census racial ratio (63% white and 37% black). These personnel fluctuations are not peculiar to Mississippi's extension program but followed a nationwide pattern of decreasing county professional staff having duplicating and sometimes conflicting assignments, increasing the number of state and area specialists and greatly expanding the use of nonprofessionals. Newly created positions of state and area specialists (other than area agents) have been staffed principally by white professionals of specialized training. Black specialists, including area agents, have received assignments in programs largely oriented to the black community. In the seven-year period since the merger, no county black professionals have been employed in 25 counties with 12% to 73% black population; excluding area agents, 46 counties remain without black professional staff. Black clerical assistants have been hired only in counties employing black professional staff.

12. As regards the hiring policy at the entry level positions, MCES posts job openings in the county extension offices, and encourages extension workers to refer applicants of either race who show proficiency in agriculture, home economics, and related subjects. A recruitment program is carried on at the state's colleges and universities that offer courses relevant to the extension program; and qualified students, regardless of race, are encouraged to apply. The recruitment program extends to contacts with the Mississippi Employment Service and other state agencies on a racially nondiscriminatory basis; however, MCES does not have an affirmative program for minority hiring, nor does it solicit applications from out-of-state college students. There is no announcement to the general public by newspaper or other means of advertising as to available positions. Applications for county and area positions are received at the state personnel office; they are reviewed and processed by the district agent who recommends the new hires within his territory. No person has been hired (or promoted) in those positions without the district agent's recommendation. During the period 1969 through 1972, MCES hired 148 professional workers—127 white and 21 black—for entry level positions. The percentage of white applicants (445) hired was greater than that for black applicants (136).

13. Since 1970, a master's degree for county professionals and a doctor's degree for state specialists have been established as desirable standards for promotion as well as new hiring. The court finds this policy is proper because of the educational nature of the positions and the necessity for professionals to analyze and interpret research and to be able to effectively communicate such research to others. Advanced degrees have in recent years been stressed in most state extension programs throughout the nation. MCES has followed this national trend for the purpose of upgrading its service without intent to discriminate against blacks. The desirability of obtaining advanced degrees relates directly to improving the quality of services offered by the professional staff, since advanced academic training affords the agent a unique opportunity of intensifying his knowledge after work experience and thus increasing his effectiveness in per-

forming technical, specialized functions in modern society. Prior to 1965, the black colleges in Mississippi did not offer advanced degrees, and because of segregation in the state's other educational institutions, black agents had to leave Mississippi to earn advanced degrees. However, MCES provided a special program of leave and financial assistance to encourage black professionals in obtaining out-of-state degrees. Since 1965, advanced degrees offered by the state's colleges and universities have been available to blacks. MCES has maintained a distinctive program of financial aid and annual and sabbatical leave for all professionals to secure advanced degrees, plus automatic salary increases upon obtaining degrees. This assistance, equally available to blacks and whites, has been implemented on a racially nondiscriminatory basis. Increasing numbers of agents of both races have earned, or are in the process of earning, advanced degrees for the betterment of extension work throughout the state.

14. MCES has since 1962 employed an evaluation instrument which it developed in conjunction with USDA specialists to appraise the job performance of every county professional worker. This evaluation occurs annually when the worker is graded by his district agent and district program leader on the basis of their contacts, observations and study of the worker during the preceding 12 months. The evaluation instrument has been periodically revised, and the maximum possible score on the form presently used is 58 points. The same form is utilized to evaluate all county professional workers, irrespective of their positions; each worker is graded independently by two supervisors whose responsibility is limited to evaluating the professionals employed within the dis-

trict. No grading is done on a state-wide basis. The district evaluators are admonished against grading on general impressions and are directed to consider separately the various items set forth in the form, thus analyzing "all performance factors to avoid bias." [10] The instrument is a comprehensive one which attempts to measure knowledge and proficiency as well as personal traits such as attitude, personality, temperament and habits. Although the job performance appraisals are made by competent persons who strive to act consistently and impartially in awarding scores, their evaluations are influenced, in substantial part, by judgments of a subjective nature, and do not altogether rest upon objective factors. All workers are ranked in accordance with this evaluation procedure. The scores received on the evaluation instrument have a significant racial impact, since the average score for blacks over a five-year period, 1967–71, is 5.72 points less than the average score for whites. This differential represents more than 10% of the average score for white professionals. The possibility of this difference occurring in a racially unbiased promotion system is less than $\frac{1}{10}$ of 1%, or a statistical improbability from mere chance. The evaluation instrument was not based upon job analysis performed for the professional jobs. Indeed, MCES presented no data of any kind to demonstrate that the evaluation form, as presently used, is a valid predictor of employee job performance, nor has it made any special studies to validate the form's use with black extension workers. MCES relies solely upon generalized opinions that its evaluation instrument is job-related and racially nondiscriminatory.

15. MCES offers a continuing program of in-service training in which every extension agent participates.

---

10. These performance factors, each of which is subdivided into various categories, with their top score values, are listed as follows:

| | | |
|---|---|---|
| 1. | County rural area development program | 10 points |
| 2. | Annual plan of work | 6 points |
| 3. | Execution of plan of work | 10 points |
| 4. | Evidence of results | 15 points |
| 5. | Working relationship | 17 points |

An agent's work load, with 7 points, was eliminated several years ago as a performance factor.

These programs are designed to improve an agent's technical knowledge and increase his understanding of the extension programs. Every agent is involved in numerous in-service training sessions in the course of a year that relate to different areas of subject matter. A test is administered after each training session to ascertain how well the agent learned or understood the material thus presented. The training sessions are necessary for an extension worker's continuing education, which is indispensable to his job. The grades made by a worker are disclosed to him; they are placed in his file and are used to measure his technical knowledge. These examinations have a legitimate purpose; they are uniformly administered to everyone, and are graded in an impartial and racially nondiscriminatory manner.

16. The beginning salaries in MCES are basically the same for all new hires in the same position. A worker uniformly receives an increase at the end of the first year's service and also upon obtaining a master's degree. Other salary increases, however, are directly based upon an agent's "job performance" as evaluated by the district agent and also upon the size of county contributions paid directly to county extension workers. Historically, black agents were paid substantially less than white agents of comparable education and experience. Salary differentials were materially reduced in 1966, after the merger, and the gap has steadily narrowed in the ensuing years. Nevertheless, the average salary paid to white professionals continues to be somewhat greater than that received by blacks, irrespective of academic degree and years of experience. This disparity in salary is largely due to the lower ratings consistently received by black employees for job performance as determined by use of the evaluation instrument.

C. *Agricultural Services of Farmers*

17. MCES has a diversified and multifaceted program of advising farmers on the best procedures to engage in agricultural pursuits and to grow, market, process and use farm products. The essence of this service is to encourage farmers to adapt scientific methods to meet their individual needs and to adjust farm operations to changing economic conditions. Every aspect of farming is covered in educational programs which utilize various teaching methods in efforts to widely disseminate practical information to clientele. These methods include the preparation and distribution of publications, bulletins, circulars and other written materials, newspaper stories, and the use of radio, television and other mass media. In addition, agents and specialists present lectures, lead group discussions and conduct tours to farms to impart useful information, as well as handling telephone calls, writing letters and carrying on result demonstrations. The goal is to reach as many people as possible with helpful assistance in the programs of interest to them. The overwhelming evidence establishes that this highly diversified advisory service is presented without racial discrimination or distinction. Indeed, MCES emphasizes that agents must work with clientele of both races and endeavor to bring information of practical value to the farm community served by the different county extension offices. Special programs have been devised and implemented throughout the state to meet the particular needs of low-income farm families, including many black persons. Typical projects are the feeder pig program, the vegetable program, the safeguard project for the use of pesticides, the Alcorn A & M branch program, Expanded Food and Nutrition Education program, the $1,000 program to stress special earnings for low-income farmers, and specialized seminars tailored to the problems of small black and white farmers.

18. In the delivery of farm services, MCES stresses with its agents that they are required to deal alike with the needs of black and white farmers as well as the needs of large and small farmers,

that racial discrimination may not be shown in dealing with any segment of the clientele, and that their mission is to aid farmers generally by disseminating useful information to them. These are standing instructions to county and area extension workers and, in the main, they are followed in the field by agents in the various program areas. As a general rule, the professional workers have duties and responsibilities which bring them into regular contact with clientele of both races in accordance with MCES directives. However, black agents, in some cases, have elected to work predominantly with black clientele either because of practices which prevailed before the 1965 merger or because of a conviction that they are more effective with the black community.

19. All mass media practices, methods, meetings, programs and activities sponsored by MCES for farmers are fully integrated. Although farmers' participation in any activity is on a voluntary basis, the entire program initiated and carried on by MCES and its agents and employees is racially nondiscriminatory.

## D. *Home Economist Services*

20. The services provided to homemakers by extension home economists are open to women of both races on a racially nondiscriminatory basis. These diversified programs are carried on through a variety of teaching methods and techniques, including maximum use of mass media. The organized club concept, however, is utilized for homemakers who desire to participate in organized groups. Homemaker clubs, formerly known as home demonstration clubs, are organized in the local neighborhoods by unpaid persons interested in learning home economics in a group setting. These clubs are largely segregated by race and select leaders of their own choice. MCES does conduct leadership training programs for these club leaders, and the training meetings are fully integrated. Club leaders serve on a voluntary basis, secure information of

interest to a particular group of women and thereafter act as leaders. The homemaker clubs in each county determine whether or not to organize into a county council, a group composed of elected officers from the community homemaker clubs. Where this results, the county's homemaker council is fully integrated and the local extension home economist acts as advisor to the group. There also exists a state extension homemaker council, which is fully integrated and with which county homemaker councils may voluntarily affiliate. All contests and events sponsored by extension home economists' staff are open to participation by all, regardless of race. Home economists' programs are devised by committees composed of professional workers of both races.

## E. *4–H Program and Activities*

21. Youth development through the 4–H program is one of the major functions of MCES. Approximately 195,000 Mississippi youths participated in 4–H activities in 1973. The 4–H program primarily seeks to develop good citizenship and character in its members through an organized educational process under the auspices of MCES. Individual and team contests and projects are sponsored by 4–H to encourage personal achievement. At the grassroots level, the 4–H program is organized into local or community 4–H clubs which consist of adult leaders and individual youth members. These local or community clubs are largely segregated by race. Although MCES does not participate directly in the administration or supervision of local groups, it unquestionably gives its sanction to their organization and segregated character and MCES functions to recruit and train local adult leaders. Above the local club level every phase of 4–H organization and activity is fully integrated, including 4–H junior and advisory councils, leader training, contests, conferences, and other events. Participation in the 4–H program and activities is entirely voluntary on the part of adult leaders and individual youth members.

22. Prior to September 1965, the 4–H program at the local level was organized and administered primarily within the school systems of the state. In 1965, the determination was made by MCES to develop and expand short-term activities in the schools but to discontinue the traditional 4–H club program at schools and reorganize local clubs on a community basis. This decision was made because of the declining effectiveness of school-oriented administration of the older program at the local level and reflected a nation-wide trend. The decision, although not racially discriminatory in purpose, resulted in the formation of many racially segregated clubs.

23. In 1965 MCES maintained three camps at Ocean Springs, Sardis Lake and Flora Parrish for the summer recreational use of 4–H youth members. The camps were attended on a racially segregated basis; the camps at Ocean Springs and Sardis Lake were attended solely by white youths and the Flora Parrish camp was attended solely by black children. In the wake of the Civil Rights Act of 1964 all three camps were closed in 1966, but were reopened in 1967 on a freedom-of-choice plan adopted by MCES. The plan resulted in no actual desegregation and was subsequently disapproved by the Department of Agriculture. In 1969 the largest camp located at Ocean Springs was destroyed by Hurricane Camille. Thereafter, in 1970, MCES discontinued 4–H camping activities. The court finds that the discontinuance of camping activities was not motivated by a racially discriminatory purpose, nor did the termination of camping activities for all 4–H youths have a racially discriminatory result or effect. The final administrative decision to discontinue the 4–H camping program was based on a culmination of several nonracial factors which militated against continuing the activity. First, physical facilities were dwindling. Actually, MCES had maintained four camps prior to 1965. The lease was lost on one camp in 1965. In 1969 with the loss of the largest camp at Ocean Springs, the availability of facilities was critically limited. A second factor was the general deemphasizing of recreational programs for 4–H youth in favor of activities which were more educationally oriented. Thirdly, the soaring costs incident to the camping program were becoming prohibitive.

F. *Individual plaintiff-employees*

CHARLIE F. WADE

24. In October 1969, Walter Sullivan, the white county agent of Holmes County, announced his retirement and two months later was replaced by James Nelms, a white agent with a bachelor's degree and two years experience with MCES who had been an area agent in cotton. This action was first taken without announcing the vacancy. Wade, having a bachelor's degree and also having completed some course work on his master's, had 13 years experience with MCES and was the senior male member of the Holmes County extension staff. He had previously served as associate Negro county agent and as Negro county agent of Holmes County. Although Wade was interested in the vacancy, the district agent determined that Wade was not qualified and recommended Nelms for the position of county agent. At trial this was sought to be justified by showing that Nelms had received a higher evaluation score than Wade, that Wade's in-service training tests indicated a lack of technical knowledge and that he exhibited inattentiveness to duty and a lack of comprehension as to the nature of extension work. However, the more credible evidence is that Wade had a long record of useful service with MCES but was not considered for the vacancy because of the belief that Holmes County was not ready to accept a black county agent. Wade was not recommended for the top county position because of his race. That Wade has not applied for promotion in other counties since 1969 is no bar to his claim of discrimination which occurred in Holmes County.

## LAVERNE Y. LINDSAY

25. In April 1966, a vacancy occurred in the position of extension home economist in Holmes County, and Ms. Jocelyn W. Frizzell, a white agent, was appointed to fill the vacancy. No applications were taken. Both Ms. Frizzell and Ms. Lindsay had practically the same tenure, but Ms. Lindsay held a master's degree, while Ms. Frizzell had a bachelor's. As former Negro associate home demonstration agent and later as Negro home demonstration agent in Holmes County, Ms. Lindsay had worked with all phases of the extension program; Ms. Frizzell's experience had been exclusively with youth activities. Despite her superior objective qualifications, Ms. Lindsay was not considered for the post. At trial, the appointment of Ms. Frizzell was sought to be justified on the basis of her having a greater "ability to get along with people in the county and to work with the whole county program." The court finds that Ms. Lindsay was qualified to be appointed extension home economist but was not promoted to the vacancy in Holmes County because of racial considerations, and her failure to apply for vacancies occurring in other counties does not preclude her from relief.

## ATHANIEL H. MOODY

26. In October 1972, a vacancy occurred in the position of county agent of Jones County, and Moody applied for it after having become a plaintiff in the present litigation. He is the brother-in-law of Ms. Lindsay. Moody was the only black applicant for the position but three whites also applied. The position went to Harold T. Hardee, the white associate county agent of Jones County. This applicant had a master's degree and practically the same tenure with MCES as Moody, who held only a bachelor's degree. Apart from Hardee's superior rating on job performance, his scores on tests to determine technical knowledge were higher than Moody's. Moreover, Hardee had been voted an outstanding agent and was active in community af-

fairs. Hardee's selection as county agent of Jones County over all other applicants was clearly justified on the basis of objective qualifications, and Moody was not discriminated against because of race.

## II. CONCLUSIONS OF LAW

### a. The Merger

We first consider the claim of plaintiffs and plaintiff-intervenor concerning discriminatory employment practices of MCES. By the overwhelming weight of evidence we are led to the inescapable conclusion that certain employment practices and procedures promulgated and implemented by MCES have impermissibly discriminated against black employees and prospective black employees on account of their race and, therefore, cannot be tolerated under the constitutional guarantees of the Fourteenth Amendment.

The major purpose of the Equal Protection Clause of the Fourteenth Amendment was to protect citizens of the black race from discriminatory state laws, Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 940, 29 L.Ed.2d 438 (1971), and discriminatory policies and practices emanating from official state sources. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Unquestionably, the racially discriminatory employment practices of MCES satisfy the state action requirement of the Fourteenth Amendment. Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); cf. Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

It is uncontrovertible that prior to 1965 MCES historically maintained a racially segregated extension program. Of course, state action which mandates or encourages segregation on the basis of race is constitutionally impermissible, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Johnson v. State of Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963); however, it is not the maintenance of a

racially dual organization prior to 1965 that now concerns the court. Rather, the point of critical importance is that the consequences of the dual system resulted in a would-be merger whereby black employees who were at comparable job levels with white counterparts, albeit on a segregated basis, were summarily demoted in job title, authority, and responsibility. The consolidation occasioned no corresponding loss by white extension workers at any level. These plain facts require that we reject as unfounded defendants' contention that the 1965 merger resulted in a mere change in nomenclature of the affected positions, without impairing anyone's authority. Nor can we say that the discriminatory impact of the merger was avoided or even diminished by the subsequent salary increases to persons in the former positions of Negro county agent and Negro county home demonstration agent. In Lee v. Macon County Board of Education, 453 F.2d 1104, 1109 (5 Cir. 1971), the Fifth Circuit, speaking through Judge Goldberg, stated the applicable standard to professional school personnel, which we deem controlling as to black professional employees affected by the merger in the case sub judice:

> "Salary is not the only apogee in our hierarchy of values, and a truly dedicated educator, presumably the sort of educator that school boards would seek, will often minimize his monetary returns in exchange for factors that are more treasured by him as an administrator or teacher. The real gist of demotion is a reduction in responsibility, not in salary."

Moreover, it is significant that during the merger not a single black was offered the position of district agent, county agent or extension home economist. While defendants argue that white agents had superior administrative experience, this generalization is not borne out by the evidence. Even so, it would not be permissible for defendants to justify actions based upon a criterion rooted in defendants' own prior discrimination. The elevation in 1962 of all white county agents to the position of county leader underscored the discrimination inherent in the former dual system.

In reviewing the essentially undisputed evidence relating to the 1965 merger, we believe that a prima facie case of discrimination was amply made out. Plaintiffs urge that the statistical data alone is sufficient to support an inference of racial discriminatory demotion of black personnel during this period. We must agree. It is a familiar principle that in racial discrimination cases, statistics are to be given proper effect by the courts in supporting the charge of discrimination. United States v. Jacksonville Terminal Co., 451 F.2d 418 (5 Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Hawkins v. Town of Shaw, 437 F.2d 1286 (5 Cir. 1971), aff'd en banc, 461 F.2d 1171 (5 Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8 Cir. 1971). Moreover, we are convinced that a significant number of black professionals serving the Negro branch of MCES possessed equal or comparable qualifications and experience as their white contemporaries; and many black professionals prior to the merger were performing jobs functionally identical to white professionals. Where the circumstances dictated the integration of public employees which necessitated the demotion of some individuals in rank or responsibility, all employees were constitutionally entitled to be judged equitably in the process. This was inescapably true in the context of racial classifications. Therefore, it was incumbent upon MCES to adopt and apply reasonable, objective and racially nondiscriminatory criteria in reassigning employees in the merged organization. Since MCES failed to act in accordance with this standard, the practices and procedures employed to effectuate the merger violated the Equal Protection Clause of the Fourteenth Amendment. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5 Cir. 1970), cert. denied, 396 U.S. 1032, 90 S.Ct. 608, 24

L.Ed.2d 477 (1970); Strain v. Philpott, 331 F.Supp. 836 (M.D.Ala.1971).

b. *Sequelae*

(1) *Promotions*

■ Having delineated defendants' constitutional transgressions arising from the merger of the segregated branches of MCES, this court has the power and the duty to exercise its equity powers to fashion reasonable and workable relief that will remedy past as well as future discriminatory practices and policies. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Morrow v. Crisler, 479 F.2d 960 (5 Cir. 1973), petition for rehearing en banc granted. Before doing so, however, it is necessary that we consider to what extent voluntary revision of defendants' employment practices following the merger has mitigated the discriminatory character of the merger or if employment discrimination has been perpetuated.

In support of MCES's promotion policies since 1965, defendants urge that they have adopted racially nondiscriminatory criteria. Additionally, in January 1970 a district-wide vacancy announcement procedure was instituted which became state-wide two years later. It is notable that the total number of black personnel has risen significantly through promotions or new hires, and the ratio of total black to white personnel presently corresponds closely to the state's 1970 census ratio. Nonetheless, the number of black *professionals* promoted at the district and county levels has been minimal. It is to the district and county professional positions that plaintiffs and plaintiff-intervenor direct their most convincing argument of racial discrimination in employee promotions.

■ Once again, the statistical evidence before the court strongly supports the position of plaintiffs and plaintiff-intervenor. During the period between 1965 and 1970, no black was promoted to the position of county agent or extension home economist, although approximately 87 vacancies occurred and it was conceded by extension personnel that there were blacks in the organization who were qualified to fill these positions. District agents, who were white, selected employees for promotions without receipt of applications. The evidence reflects that MCES was deterred in recommending the appointment of blacks to county positions during this period by opposition expressed by some county supervisors. However, it has long been settled that neither community hostility nor local custom may obviate the efficacy of the Equal Protection Clause. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Since the adoption of the vacancy procedure, only two blacks have been promoted to extension home economists and only one black to the position of county agent. Thus, it is apparent that regardless of defendants' adoption of promotion criteria and announcement procedure, the stark realities of these figures indicate a continuing disparity in the treatment of MCES employees on account of their race.

We find no fault with defendants' state-wide vacancy announcement procedure; indeed, it is a significant step forward in nondiscriminatory treatment of employees. That so few blacks have applied for promotions does not demonstrate a lack of interest but rather indicates that, given the history of discriminatory practices, blacks concluded that it was futile, if not ill-advised, to apply for higher professional jobs when vacancies occurred. Cf. Cypress v. Newport News General & Nonsectarian Hosp. Ass'n., 375 F.2d 648 (4 Cir. 1967). Even with exemplary administration of the announcement procedure, however, a major obstruction to the promotion of qualified blacks to district and county professional positions is the continuing failure of MCES to adopt and implement reasonable and objective promotion criteria which are truly racially nondiscriminatory.

142

We have considered defendant's earnest contention that all five criteria which they presently use are objective, job-related standards that are racially nondiscriminatory, both on their face and as applied. We must disagree. Passing the threshold question arising from an apparent lack of specific weight assigned to each standard, we can accept three of the stated criteria as objective, job-related and capable of being non-discriminatorily applied, viz: degree, years of experience and uniform testing to determine technical knowledge. The difficulty, however, is encountered in dealing with the two remaining criteria. One of these is known as "concept of the job applied for", a term which was only loosely characterized by defendants' witnesses and never reduced to an understandable formula; as such it is a criterion quite incapable of uniform administration and readily susceptible to bias. Even more noteworthy, the so-called "objective appraisal of job performance"—admittedly the most significant of all five criteria—is based upon scores received by subordinates rated by supervisors on an evaluation instrument according to a number of questionable factors. For example, a substantial portion of the evaluation rating relates to such general characteristics as leadership, public acceptance, attitude toward people, appearance and grooming, personal conduct, outlook on life, ethical habits, resourcefulness, capacity for growth, mental alertness, and loyalty to organization. As may be readily observed, these are traits which are susceptible to partiality and to the personal taste, whim, or fancy of the evaluator.[11] We must thus view these factors as presently utilized to be patently subjective in form and obviously susceptible to completely subjective treatment. United States v. Texas Education Agency, 459 F.2d 600 (5 Cir. 1972); United States v. Coffeeville Con-

solidated School District, 365 F.Supp. 990 (N.D.Miss.1973).

Where a considerable portion of the evaluation depends upon judgment of a vague and subjective nature, as here, the entire procedure is permeated with susceptibility to bias, making it "a ready mechanism for discrimination against Blacks." Rowe v. General Motors Corp., 457 F.2d 348, 359 (5 Cir. 1972). Undeniably, the job evaluation scores, which on the average rate blacks lower than whites, have a significant racial impact. This casts upon defendants the burden of negating an inference of discrimination by clear and convincing evidence; more than mere denials of discrimination had to be presented. "Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted." Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (4 Cir. 1972). To uphold its practice, MCES had to demonstrate that the evaluation instrument had a known significant relationship to job performance, and its use was necessary to serve legitimate employment needs of the extension service. Yet, the defendants failed to establish that the evaluation procedure had been validated in accordance with professionally developed standards, or that the instrument was based either upon a careful job analysis to determine the relevance of the form's content or upon studies or empirical evidence of criterion-related validity, in conformity with validation standards promulgated by the Equal Employment Opportunity Commission's Guidelines on Employee Selection Procedures, 29 CFR 1607, 1607.5. We find the record devoid of substantial evidence that the instrument was adequately validated and that the appraisal process did not unreasonably or unnecessarily burden blacks. Thus, the inference of racial discrimination was not effectively rebutted.

11. Quite apart from its subjectivity, the form calls for a single score in response to a series of inquiries, thus making it difficult, if not impossible, for the rater to measure specifically each aspect of job proficiency.

In the recent case of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court held that employment practices which perpetuate longstanding discriminatory preference to whites and which cannot be shown to be related to job performance are prohibited. Although *Griggs* was a Title VII suit, its principle is here controlling. Courts generally have held that standards of impermissible job discrimination in Title VII cases are not different from the test of validity under the Fourteenth Amendment and that the EEOC's guidelines may be properly considered in public employment discrimination cases. Castro v. Beecher, 459 F.2d 725 (1 Cir. 1972); United States v. Chesterfield County School District, 484 F.2d 70, 73 (4 Cir. 1973); Allen v. City of Mobile, 331 F. Supp. 1134 (S.D.Ala.1971), aff'd, 466 F.2d 122 (5 Cir. 1972); Davis v. Washington, 352 F.Supp. 187, 191 (D.D.C. 1972). Cf. Baker v. Columbus Municipal Separate School District, 462 F.2d 1112, 1114 (5 Cir. 1972). Moreover, for all public job discrimination cases arising after March 24, 1972, Congress has specifically made Title VII applicable to the conduct of State employers. 42 U.S.C. § 2000e(b) (Supp.1973).

The First Circuit in *Castro*, a Fourteenth Amendment public employment case, said at 732 of 459 F.2d:

"The public employer must, we think, in order to justify the use of a means of selection shown to have a racially disproportionate impact, demonstrate that the means is in fact substantially related to job performance. It may not, to state the matter another way, rely on any reasonable version of the facts, but must come forward with convincing facts establishing a fit between the qualification and the job."

The Fifth Circuit in *Baker*, a case of unlawful discrimination in the retention and employment of public school teachers, held at 1114 of 462 F.2d:

"In order to withstand an equal protection attack, it [an employment practice having a racially discriminatory effect] must be justified by an overriding purpose independent of its racial effects."

In the case sub judice, plaintiffs and plaintiff-intervenor clearly established a prima facie case of continuing racial discrimination in defendants' promotion policies by credible statistical evidence. United States v. Jacksonville Terminal Co., supra; Hawkins v. Town of Shaw, supra; Carter v. Gallagher, supra. The failure of MCES to promote any blacks into professional district and county positions prior to 1970 and proof of only minimal promotion of blacks into those positions thereafter raises a presumption of discriminatory promotion practices. Thus, the discriminatory effect of MCES' promotion policies having been firmly established, the burden was on defendants to overcome the presumption by satisfactory proof that their actions were based on nonracial objective promotion standards. Rowe v. General Motors Corp., supra; Brown v. Gaston County Dyeing Mach. Co., supra; Singleton v. Jackson Municipal Sep. School Dist., supra; Lee v. Macon County Board of Education, supra. In our view, defendants failed to meet this burden.

### (2) *Hirings, Assignments, and Salaries*

Since it appears that 369 blacks, or 64% of the total nonprofessional workers, are currently employed by MCES, this showing is insufficient to support an inference of racial discrimination in those categories. The smaller number of blacks in clerical positions is more than offset by the substantial number of blacks employed as aides. Rather, the discrimination against black clerical assistants and aides primarily related to work assignments. Nevertheless, the fact that only 14% of the current professional staff is black does establish a prima facie case of racial discrimination in hiring.

The failure to announce vacancies and the exclusive use of "word-

of-mouth" announcements prior to 1970 discriminatorily favored whites since the professional staff was predominantly white and 25 counties had no county black staff. United States v. Georgia Power Co., 474 F.2d 906 (5 Cir. 1973). Nor is this defect cured by the present practice of sending vacancy announcements to employees when the professional force is 86% white and numerous counties remain without black personnel. Granted that the current recruitment program is racially neutral, no special efforts are made to attract qualified blacks to become extension workers, nor does MCES utilize methods of advertising or communication to reach substantial portions of the Negro population in Mississippi. MCES has not established any affirmative hiring program for black professionals. Since the recruiting practices conventionally employed by defendants have served to perpetuate existing racial patterns of employment, they are violative of federal law. Morrow v. Crisler, 4 EPD ¶ 7563, pp. 5239–40 (S.D. Miss.1971), aff'd, 479 F.2d 960 (5 Cir. 1973), petition for rehearing en banc granted; United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970).

■■ MCES assigns blacks almost exclusively to counties where there was black extension personnel before merger. It admittedly assigns a disproportionate number of black employees to programs serving a predominantly black clientele, i. e., the expanded food and nutrition education program, the vegetable crop program and the swine program.

It is settled that teachers cannot be assigned to students on the basis of race. United States v. Jefferson County Bd. of Education, 372 F.2d 836 (5 Cir. 1966). This same prohibition has been applied in the assignment of black policy officers. Baker v. City of St. Petersburg, 400 F.2d 294 (5 Cir. 1968). The Court there articulated the standard which must be met where racial assignment is sought to be justified:

"When the State by statute or its officials by administrative act estab-lish racial classifications, the fourteenth amendment commands the application of stringent standards of rationality." at 297.

\* \* \* \* \* \*

"[T]he burden will be on the defendants to prove that the purposes sought to be achieved by the pattern . . . could not be achieved without the overt racial classification." at 301.

In accord is Strain v. Philpott, supra, where the court condemned the policy of the Alabama Extension Service of assigning blacks only to counties where they had been assigned before merger and to low income areas. Similarly, in United States v. Frazer, supra, the Court found to be constitutionally impermissible the assignment of black employees of the Alabama Department of Industrial Relations to classifications of exclusively or predominantly Negro case load and areas.

■■ Disparate salaries based on race are, of course, constitutionally impermissible. Reynolds v. Board of Public Instruction for Dade County, 148 F. 2d 754 (5 Cir. 1945), cert. denied, 326 U.S. 746, 66 S.Ct. 53, 90 L.Ed. 446 (1945); Arkansas Educational Ass'n. v. Board of Education, Portland, Ark. School District, 446 F.2d 763 (8 Cir. 1971). This forbids the use of subjective judgment in evaluating job performance for granting salary increases which favor whites over blacks. The court concludes that the discontinuance of discriminatory practices in hiring and promotion policies will obviate racial inequalities that remain in MCES' salary schedule.

c. *Discrimination in Services*

Consistent with our prior findings (No. 17–22), we hold that clientele services provided by MCES, subject to two exceptions, are free of racial discrimination and do not deny black clientele equal protection of the law. The two exceptions arise from the fact that most of the homemaker clubs and 4–H clubs

have members of only one race, with separate clubs organized for whites and for blacks. Admittedly, every phase of club activity, above the level of local membership, is integrated, and all direct contacts between MCES staff and the local club leadership are racially non-discriminatory.

 MCES argues that this separation of the races results from the voluntary, or freedom-of-choice, decisions personally made by club members, for which it has no concern or responsibility. It is a settled principle that private racial segregation becomes subject to constitutional restrictions when "to some significant extent the State in any of its manifestations has been found to become involved in it." Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Additionally, the MCES programs are within the ambit of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which mandates that no person shall, on account of race, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." It is no answer to say that agents are instructed not to attend racially segregated club meetings. The MCES sponsorship of the 4–H clubs and homemaker clubs, its recruiting and training of club leadership, and its establishment of activity programs and goals for the local clubs amount to a significant involvement of the state with the private association of club members. These services are a form of specific and definite assistance which the state undertakes to provide for homemaker and 4–H club members, and not generalized help available to all citizens. Necessarily, MCES, by reason of its leadership role and participation, makes the state a partner or joint venturer in the local club enterprise, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); as such, the state cannot engage in partici-pation that has a significant tendency to facilitate, enforce and support private discrimination. Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); accord, Smith v. Young Men's Christian Ass'n. of Montgomery, 462 F.2d 634 (5 Cir. 1972); Adams v. Miami Police Benevolent Ass'n, Inc., 454 F.2d 1315 (5 Cir. 1972). While MCES is free to devise and carry on programs with 4–H youths and homemakers in accordance with such format and means as it may deem appropriate, nevertheless, those programs must be consistent with the constitutional mandate against racial segregation. Thus, defendants are required to take reasonable steps to eliminate discriminatory practices of local clubs by assuring that all private groups sponsored by MCES or affiliated with its program are racially nondiscriminatory in their membership policies and methods of operation. These steps include the discontinuance in MCES' sponsoring youth activities at racially segregated, private schools established to avoid public school desegregation, since such sponsorship is a state aid prohibited by the Constitution. Norwood v. Harrison, supra.

 The court holds on the basis of its prior finding (No. 23) that the discontinuance of the entire 4–H camping program for all youths was not racially motivated and MCES' decision in that regard does not contravene federal law. Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438, is, in our opinion, dispositive of this aspect of the case.

d. *Relief.*

The court is concurrently herewith entering its order for declaratory and injunctive relief in accordance with the views heretofore expressed. No relief, of course, is allowed on the individual claims of Athaniel H. Moody as employee and Howard T. Bailey as client-farmer.

Appropriate relief in racial discrimination cases to satisfy the demands of justice is often perplexing and difficult to devise. Even federal judges, despite

their sworn fealty to the Constitution, are not without limitations in this field. "There are no experts in the solution of problems created by racial prejudice", declared Circuit Judge Roney, speaking for the majority in Morrow v. Crisler, supra, at 964 of 479 F.2d. The case sub judice presents unusual challenge and complexity. In the final analysis, the efforts of courts to remedy racial wrongs are judged by the same standards that apply in other endeavors, i. e., judicial efforts are sound when they are reasonable, realistic and workable. Swann v. Board of Education, 402 U.S. at 31, 91 S.Ct. 1267. *Swann* also instructs that: "Remedial judicial authority does not put judges automatically into the shoes of school authorities whose powers are plenary. Judicial authority enters only when the local authority defaults." Id. at 15–16, 91 S.Ct. at 1276.

Applying those basic considerations, we do agree that more is required than a prohibitory decree against continued racial discrimination. For, once constitutional violation has been shown, courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). We believe that this court should grant affirmative remedial relief to combat racial discrimination inherent in defendants' employment practices. This leaves for our determination what should be the *proper nature and character* of that affirmative relief, in the proper exercise of broad equity powers which the Supreme Court accords to a federal district court. By our accompanying order, we have endeavored to exercise that discretion in a just manner.

 Only one aspect of the relief deserves further comment. Plaintiffs and plaintiff-intervenors have strongly urged upon us *to impose a minimum quota*, or fixed racial ratio, in promoting qualified blacks from a predetermined pool and similar techniques in hiring of blacks as new personnel. They argue that many courts have ordered the hiring of blacks or other minority groups on a one-to-one, or like, basis until specific goals are attained. See Carter v. Gallagher, supra; Castro v. Beecher, supra; Alabama State Troopers, NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala. 1972), and other cases collated in Judge Goldberg's dissenting opinion in *Morrow* at 971–975 of 479 F.2d. Stringent mandatory relief of such character is no doubt justified by clear facts in certain cases, but the appropriateness of relief, in our view, is not to be considered in the abstract, but only in the light of cogent circumstances shown by the evidence in a particular case. For a variety of reasons, it is our opinion that our decree should be cast in terms which do not presently require fixed ratios in hiring and promotion of blacks, but rather that qualified blacks in substantial numbers at all levels of MCES employment be employed throughout Mississippi and that plans to accomplish that goal be formed without delay and implemented within a reasonable time. Absent reasonable success within that framework, it would become appropriate for the court to consider stringent relief necessary to eradicate any remnant of racially discriminatory practices.

The foregoing approach is reasonable and correct because of a number of considerations disclosed in this case, including: (1) qualified blacks, in the words of A. Marx, the state's first black county agent, have now begun to "eat the pudding". This has been demonstrated by the selection of at least three blacks for top county positions and the likely recommendation of still more. Although these promotions may have been hastened by the pendency of this suit, they nevertheless show that MCES has not adopted an intransigent attitude against change; (2) the recently inaugurated vacancy announcement procedure, of statewide scope, should encourage more blacks to apply, given the assurance of objective consideration; (3) the unique nature of a variegated, highly specialized, statewide educational service, directed mainly by profes-

sionals—quite different from the conventional fire, police or sanitation department of a municipality or even the faculties of a single school district—suggests that an extra measure of caution is needed before ordering drastic realignment within the organization; (4) the keen public interest of Mississippi citizens in the ability of the Extension Service to deliver vital agricultural services, and to continue improvement of those services, is plainly a substantial factor which favors a careful and well-planned approach; and (5) the dramatic reversal of positions by the Secretary of Agriculture and the federal extension officials since the bringing of this suit —they first denied and later admitted participation in discriminatory practices—should strongly influence defendants in discontinuance of discriminatory practices, since the federal interests furnish both money, ideas and leadership essential to the state program.

Let judgment be entered accordingly.