528 F.2d 508
 12 Fair Empl.Prac.Cas. 1041,
11 Empl. Prac. Dec. P 10,770
Charlie F. WADE et al., Plaintiffs-Appellees,
United States of America et al., Plaintiffs-Intervenors-Appellees,
v.
MISSISSIPPI COOPERATIVE EXTENSION SERVICE et al.,
Defendants-Appellants.
 No. 74--2065.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 24, 1976.
 
 William A. Allain, 1st Asst. Atty. Gen., State of Miss., A. F. Summer, Atty. Gen., C. A. Marx, Spec. Asst. to Atty. Gen., Jackson, Miss., Fred B. Smith, Ripley, Miss., Heber Ladner, Jr., Jackson, Miss., for defendants-appellants.
 Frank R. Parker, Jackson, Miss., for Wade and others.
 H. M. Ray, U.S. Atty., Oxford, Miss., Mary Planty, Steven B. Glassman, Title VI Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., for U.S.A.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before BELL and DYER, Circuit Judges, and MEHRTENS, District Judge.
 BELL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the district court finding that the defendants had engaged in discriminatory employment practices, ordering declaratory and injunctive relief, and awarding reasonable attorneys' fees to plaintiffs. This class action was originally brought by employees and patrons of the Mississippi Cooperative Extension Service (MCES) against MCES and various county, state and federal defendants. The Justice Department of the United States Government subsequently intervened as plaintiffs, and the federal defendants were realigned as parties plaintiff. The defendants urge on appeal that the findings of the district court were clearly erroneous and that the court exceeded its jurisdiction in ordering certain relief against the defendants and others. After consideration of all issues raised, we affirm in part, reverse in part, and vacate and remand in part.
 
 
 2
 The plaintiffs originally filed suit in April, 1970, alleging racial segregation and discrimination by MCES in employment practices and in delivery of services by MCES, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d et seq. and the Civil Rights Acts, 42 U.S.C.A. §§ 1981, 1982, and 1983.[1]
 
 
 3
 The named plaintiffs are Charlie F. Wade, Laverne W. Lindsey, and Athaniel H. Moody, all employees of MCES; Howard T. Bailey, a Mississippi farmer; the minor children of Mrs. Odell Durham and Mrs. Laverne Y. Lindsey, members of racially segregated 4H clubs; and Mrs. Odell Durham, as a member of a racially segregated homemaker club. All the named plaintiffs are black. In December 1970, the district court certified this as a class action, and defined classes as set forth in the margin.[2]
 
 
 4
 The present defendants are MCES and its director William Bost; Mississippi State University (MSU), the land grant college that receives state and federal funds for the MCES program, and its president, William L. Giles; the Board of Trustees of Institutions of Higher Learning, which has supervisory authority over MSU; M. M. Roberts, the president of the Board of Trustees, and E. E. Thrash, the Executive Secretary and Director of the Board; and the individual members of the Board of Supervisors of Holmes County, Mississippi. The United States Secretary of Agriculture (USDA) and the administrator of the Federal Extension Service (ES--USDA) were also originally named as defendants.
 
 
 5
 The United States Attorney General moved to intervene as a plaintiff on March 25, 1971, under Title IX of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000h--2, certifying that the action was one of general public importance. On that same day, plaintiffs moved to dismiss the original federal defendants. In an order on October 29, 1971, the district court granted the Attorney General's motion to intervene as a plaintiff but denied the plaintiffs' motion to dismiss the federal defendants, suggesting that separate representation of the USDA defendants and the Attorney General intervenor-plaintiffs might be appropriate. Subsequently, the district court reversed its position in an order on January 26, 1972, finding that 'the ends of justice would be best served,' by realigning the USDA defendants as parties plaintiff, taking 'identical positions with that of the United States.' The USDA defendants withdrew their original answer, which had denied all alleged discrimination, and filed a supplemental pleading on February 25, 1972, alleging racial discrimination in the operation and employment practices of MCES.
 
 
 6
 A motion for a preliminary injunction was filed on January 1, 1973, which was denied after a hearing in February, without prejudice to renewal of the motion upon subsequent trial of the merits. The trial was held before the district court without a jury in July, 1973. The judgment of the court ordering declaratory and injunctive relief was entered on February 9, 1974, Wade v. Mississippi Cooperative Extension Service, N.D.Miss., 1974, 372 F.Supp. 126. In a supplemental opinion, entered on June 17, 1974, Wade v. Mississippi Cooperative Extension Service, N.D.Miss., 1974, 378 F.Supp. 1251, the district court awarded reasonable attorneys' fees to the plaintiffs, on the basis of this court's holding in Morrow v. Crisler, 5 Cir., 1974, 491 F.2d 1053, under the 'private attorney general' theory. The district court did not address the issue whether the defendants' conduct had been unreasonable and obdurate.
 
 
 7
 The district court certified that its February judgment was appealable pursuant to Rule 54(b), F.R.Civ.P., and also its judgment awarding attorneys' fees.[3] We will first summarize the factual findings of the district court and then consider the various grounds for appeal urged by the defendants.
 
 The MCES Program and Structure
 
 8
 MSU is the land grant college directed by the Mississippi legislature to administer the Extension Service throughout the state, as authorized by the Smith-Lever Act of 1914, 7 U.S.C.A. § 341 et seq. MCES is the division of MSU that directly administers the Mississippi Extension Program. The object of the Extension Service is to promulgate 'useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same' among the people of the United States. Financing is accomplished with federal moneys matched by funds from the state and counties participating in the program, in the following propertions: Fifty per cent federal, thirty per cent state and twenty per cent county. National leadership is provided by USDA and specifically through ES--USDA, which is an agency within USDA.
 
 
 9
 All of the MCES programs are essentially educational, with an important goal being self-betterment. The activities of MCES are carried out primarily at the county level and fall within four general categories: agriculture, home economics, 4H youth development, and community or resource development. MCES employs over 1,000 persons, a little less than half of whom are professional staff. The remainder are either nonprofessional aides or clerical employees.
 
 
 10
 At the state level, there is a director who has direct responsibility for staff organization, personnel and budget matters overall program development, and policy matters relating to employment. Such policies must receive the approval of USDA and ES--USDA. There are also a number of state specialists, who have responsibility for particular fields of knowledge and expertise.
 
 
 11
 The state is divided into four districts, each with 20 or 21 counties, which are the second highest administrative levels. At the district level, the district agent provides liaison between the state MCES and county MCES personnel and also directs the male and female district program leaders.
 
 
 12
 At the county level, overall program responsibility is placed in the county leader, who also has administrative or supervisory responsibility over other MCES employees in his county. In each county there is a county agent, who is male and who almost always serves as the county leader. His primary responsibility as county agent is providing agricultural services to farmers in the county. The county agent is appointed by the county board of supervisors, upon the recommendation of the state MCES office.
 
 
 13
 Within each county, there is an extension home economist who is female and who is responsible for providing services to homemakers, including the training of leaders for local homemaker clubs. There may also be one or more 4H youth agents in each county, who may be either male or female and who are responsible for providing leadership training or other support activities for local 4H clubs.
 
 The 1965 Merger
 
 14
 Prior to January 1, 1965, MCES was operated as a racially dual organization, consisting of a white Extension Service staffed only by whites and a similarly structured but separate Negro Extension Service, staffed mainly by blacks. The Negro branch was housed separately at both the county and state level, and there were Negro County Extension offices in only 56 of the state's 82 counties. The black county personnel were designated as Negro County Agents and Negro County Home Demonstration Agents. The Negro County Agent had supervisory and administrative responsibility for the other Negro personnel working in his county.
 
 
 15
 Beginning in 1963, the director of the Extension Service, William Bost, began to plan for a merger of the two separate services. This came to fruition in 1965, when the titles of Negro County Agents were changed to Associate County Agents, without any change in the titles of the white County Agents. The titles of all Negro Home Demonstration Agents were changed to Associate Extension Home Economists, while white Home Demonstration Agents were designated Extension Home Economists. Two years before the merger, all white County Agents has been designated as County Leaders.
 
 
 16
 Shortly after the name changes were effected, the county personnel began to be housed in the same offices. The black professional workers ceased to have supervisory or administrative authority over any subordinate professional and clerical workers, and in some instances, continued to serve primarily black clientele. The black professional workers were given a number of salary increases intended to equalize their compensation with that of white professionals holding comparable jobs with similar qualifications.
 
 
 17
 At the time of trial there had only been one black ever to have served as a professional above the county level and that was the person who had formerly supervised the Negro Extension program. Only one black had been appointed as a county agent, and that had occurred one week prior to trial. Finally, only two black women had been appointed to Extension Home Economist positions.
 
 Post-Merger Activities
 
 18
 Between 1965 and 1970, 87 persons were appointed to the positions of County Agent and Extension Home Economist, none of whom was black. The promotions were made on the basis of ostensibly racially nondiscriminatory criteria: (a) degree held; (b) length of service; (c) technical knowledge; (d) job performance; (e) concept of job applied for. Vacancies occurring during this time were filled without any prior announcement.
 
 
 19
 The holding of a bachelor's degree was a prerequisite to being hired as a professional worker. The presence of a master's degree, other things being equal, would merit some preference for a worker. Length of service was measured by the duration of employment with MCES. Technical knowledge was based on test scores on examinations given to workers following periodic in-service training sessions. Job performance was established by evaluation scores on a comprehensive evaluation instrument graded by the district agent and his program leaders. Finally, the 'concept of job applied for' was based upon the understanding of the worker, as determined by his supervisors. These five criteria were not considered in any precise, consistent ratio.
 
 
 20
 During this time, in October, 1969, the white county agent for Holmes County, in which the individual plaintiff Charlie F. Wade was Associate County Agent, was replaced by another white agent, Nelms, who had a bachelor's degree and two years experience with MCES as an Area Agent in cotton. There was no announcement of the vacancy. Wade had a bachelor's degree, but had also completed some courses toward his master's degree. In addition, Wade had thirteen years experience with MCES. The defendants attempted to show that Nelms had a higher evaluation score than Wade, that Wade's scores on inservice training indicated a lack of technical knowledge, and that he exhibited inattentiveness to duty and a lack of comprehension as to the nature of extension work. The district court found, however, that, given Wade's long record of useful service, he had in fact not been considered because of the belief by MCES that the county would not accept a black agent.
 
 
 21
 In April, 1966, the position of Extension Home Economist in that same county, where individual plaintiff Laverne Y. Lindsey had served as Negro Home Demonstration Agent, was also filled without applications being taken. In that case, a white home extension agent was appointed, although the white agent's prior experience had been exclusively with youth activities. The district court found with regard to Ms. Lindsey that she also had not been promoted because of racial considerations.[4]
 
 
 22
 In January, 1970, the director began to announce all staff vacancies in order to afford all qualified personnel an opportunity to apply for such openings. This was initially on a district wide basis, but subsequently became state wide in 1972. There have since been 89 professional vacancies for which 129 applications were made by MCES workers. Of these applicants, fourteen were black, six of whom were selected and recommended. Of the 110 white MCES applicants, ten were selected and recommended. A total of 59 positions were filled by whites from outside MCES. Twenty-eight persons have been promoted to positions of either County Agents or Extension Home Economists since 1970, three of whom were black, as noted previously.
 
 The Findings of the District Court
 
 23
 The district court found that racial discrimination existed in several specific areas, based in large part on a statistical showing, but supported by evidence of specific instances of discrimination. Aside from the findings of racial discrimination in promotion practices, the court found that the evaluation form used for evaluating professional workers was discriminatory, that assignments had been made on the basis of race, that there were disparities in average salaries of black and white professional workers, that there was a lack of affirmative action in the hiring practices of MCES, and that MCES was giving support and sanction to segregated local, voluntary 4H clubs.
 
 
 24
 The evaluation form devised by MCES was found to have a racially disproportionate effect. But of more importance, there was testimony that the form questions were vulnerable to subjective judgments by the evaluating supervisors, and that many of the questions contained too many factors to be accurate measurements of any particular trait. Finally, MCES failed to show that any objective validation of the test had been performed, other than on a self fulfilling internal administrative basis. The only response by MCES to the plaintiffs' showing was based on the generalized opinions of witnesses that the form was in fact job-related and nondiscriminatory.
 
 
 25
 The plaintiffs used a rather sophisticated method of statistical analysis to show the salary differentials between black and white professional MCES workers. This was a multi-variate regression analysis of the salaries of MCES workers that showed race to be a significant factor in setting salaries. There was other corroborative evidence of such disparities, however. Although beginning salaries for MCES workers were the same for all new personnel, subsequent salary increases were in large part determined on the basis of the discriminatory evaluation form. The salary differential shown by the analysis has been reduced since 1966, but there remains a disparity, in large part due to the use of this evaluation form. The defendants attempted to discount the statistical showing made by the plaintiffs, but there was evidence of several instances where black and white professional workers with very similar experience and qualifications received substantially different annual incomes.
 
 
 26
 With respect to the 4H and homemakers clubs program, the court found that every phase of 4H activity above the local club level was fully integrated, but that the local clubs themselves were largely segregated by race. The court also found that the removal of the 4H program from the schools, while based on nondiscriminatory factors, had resulted in the formation of many of the racially segregated clubs. The court then found that, while the MCES did not participate directly in the administration and supervision of the local groups, that it unquestionably gave 'its sanction to their organization and segregated character.'[5]
 
 
 27
 Aside from the segregated local 4H program, the court found that all of the services provided by the MCES were conducted on a completely nondiscriminatory basis. In the case of the agricultural services to farmers, MCES actively stressed that such services were to be provided to black and white clients alike. As a general rule, this has been the case. This finding was likewise true of the Home Economists' services.
 
 
 28
 On the basis of these factual findings, the district court found that it was 'uncontrovertible that prior to 1965 MCES historically maintained a racially segregated extension program.' 372 F.Supp. at 139. Moreover, the 1965 merger of the black and white extension services was found to have been discriminatory, in that the black county agents had effectively been demoted without any objective consideration of individual merit in the designation of new county agents following the merger. Finally, the court found that there were continuing discriminatory practices, despite the ostensible efforts of MCES to the contrary.
 
 
 29
 MCES was ordered to appoint individual plaintiffs Wade and Lindsey to the positions of County Agent and Extension Home Economist respectively. The court also awarded each of them back pay, while reserving the issue of class back pay. MCES was ordered to give first priority in future promotions to qualified MCES professionals and to file an adequate plan providing for their promotion to primary county, area and district positions. In addition, MCES was to formulate a salary schedule to eliminate the effects of discrimination between white and black employees.
 
 
 30
 The district court subsequently approved a plan submitted by the parties that implemented these aspects of the relief ordered. This plan sets forth objective criteria for promotion of professional employees that include credit for the level of academic degree obtained, credit for special technological ability, credit for the degree of technical knowledge as displayed in in-service training, and credit for length of service. The court enjoined the use of the performance evaluation form until an instrument could be developed and validated in accordance with EEOC guidelines and approved by the court.
 
 
 31
 MCES was ordered to adopt and implement an affirmative action program for hiring qualified blacks and to establish written, objective, nondiscriminatory standards for hiring clerical and initial professional applicants. Such standards were also in the plan approved by the court. In addition, the plan established a biracial applicant review board to assist in the processing of applications for employment. The hiring program was to include extensive efforts to publicize hiring vacancies and to recruit students at black colleges and universities.
 
 
 32
 With respect to the assignment of black personnel, the defendants were ordered to cease to assign black personnel only to counties with black professional staffs and to give qualified blacks priority consideration in transfers to other areas.
 
 
 33
 Finally, the court ordered MCES to require each sponsored 4H club 'to adopt and implement a written affirmative action plan to take all reasonable steps to eliminate all discrimination in its membership program practices.' MCES was directed to notify each organization that failure to adopt such a plan would preclude continued sponsorship. The defendants reported on August 15, 1974, that this portion of the order had been complied with.
 
 The Grounds for Appeal
 
 34
 We now consider the various grounds for error asserted by appellants. First, appellants argue that the findings of the district court were clearly erroneous, both generally, as to the finding that defendants had engaged in a pattern of discriminatory employment practices, and in particular as to the findings that the evaluation form used by defendants was discriminatory; that individual plaintiffs Wade and Lindsey were not promoted by reason of their race; and that the 1965 merger of the previously separate black and white extension services effected a demotion of black county agents. Second, appellants argue that the district court exceeded its jurisdiction and abused its discretion in ordering relief against individual 4H clubs, of which there were only black members before the court. Finally, the appellants argue that the award of back pay to the individual plaintiffs Wade and Lindsey and attorneys' fees to the plaintiff class were incorrect, under a proper interpretation of the Eleventh Amendment and the Civil Rights Acts.
 
 
 35
 We first consider the argument that the findings of the district court were clearly erroneous. We have recently considered by what standard of review an appellate court is to consider such an argument in an employment discrimination case. In Causey v. Ford Motor Co., 5 Cir., 1975, 516 F.2d 416, 420--21, we stated as follows:
 
 
 36
 At the outset, it is important to delineate our standard of review for assessing the correctness of the district court's nondiscrimination findings. Rule 52(a), F.R.Civ.P., lays down the 'clearly erroneous' test for appellate review of district court findings of fact. Under this test, a finding in clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed' by the district court. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766. See also Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776.
 
 
 37
 There exists, however a significant distinction for the purpose of applying the clearly erroneous test between findings of subsidiary fact and findings of ultimate fact. See Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219--20. Finding a subsidiary fact involves the determination of an evidentiary or primary fact; finding an ultimate fact on the other hand, 'may involve the very basis on which judgment of fallible evidence is to be made.' Baumgartner v. United States, 1944, 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525, 1529. . . With respect to ultimate findings of fact, furthermore, we noted in Industrial Instrument Corp. v. Foxboro Co., supra, 307 F.2d 783, at 786 n. 2:
 
 
 38
 We may reverse free of the clearly erroneous rule where . . . the issue revolves around an ultimate fact question as distinguished from subsidiary fact questions . . ..
 
 
 39
 See also Galena Oaks Corp. v. Scofield, supra, 218 F.2d 219.
 
 
 40
 Although discrimination vel non is essentially a question of fact it is, at the same time, the ultimate issue for resolution in this case, being expressly proscribed by 42 U.S.C.A. § 2000e--2(a). As such, a finding of discrimination or nondiscrimination is a finding of ultimate fact. See Hester v. Southern Railway Co., 5 Cir., 1974, 497 F.2d 1374, 1381; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 423--24. In reviewing the district court's findings, therefore, we will proceed to make an independent determination of appellant's allegations of discrimination, though bound by findings of subsidiary fact which are themselves not clearly erroneous. Also, as in Humphrey v. Southwestern Portland Cement Co., 5 Cir., 1974, 488 F.2d 691, 694, we must determine whether there are requisite subsidiary facts to undergird the ultimate facts. 516 F.2d at 420--21.
 
 
 41
 With these comments in mind, we now consider the various evidentiary points raised by appellants.
 
 Statistical Evidence
 
 42
 Appellants argue that the statistical evidence introduced by plaintiffs was insufficient to give rise to an inference of discrimination and that, consequently, plaintiffs failed to make a prima facie showing of discriminatory employment practices. It is, of course, beyond dispute that statistical evidence alone may enable the plaintiffs to satisfy their initial burden of showing discrimination. United States v. T.I.M.E.--D.C., 5 Cir., 1975, 517 F.2d 299, 313--14; Sabala v. Western Gillette, Inc., 5 Cir., 1975, 516 F.2d 1251, 1261; Rodriguez v. East Texas Motor Freight, 5 Cir., 1974, 505 F.2d 40, 55. Appellants essentially challenge the probative value of some of the statistical evidence introduced by plaintiffs, because of the sophisticated nature of the methods used to analyze the statistical data. Their challenge is based in large part on the testimony of their own expert witness, who indicated that such methods were, in his view, inappropriate for use in a social science setting.
 
 
 43
 The difficulty with appellant's position is that the district court did not appear to rely solely on the plaintiffs' sophisticated tool of statistical analysis, but rather on the more easily understood data itself. As this court has noted in examining statistical evidence in a school desegregation case, 'nothing is as emphatic as zero.' United States v. Hinds County School Board, 5 Cir., 1969, 417 F.2d 852, 858. In this case, although there were 87 vacancies for County Agent or Extension Home Economist between 1965 and 1970, no black was promoted to such a position, even though Extension personnel conceded that there were in fact qualified blacks for those positions.
 
 
 44
 There is a second difficulty with appellants' challenge of statistical evidence, in that they have failed to distinguish the particular relevance of the various elements of that evidence. For example, the particular analytical method most criticized by the appellants, multi-variate regression analysis, related primarily to the question of whether race was a factor in determining the respective salary levels of black and white extension professional workers. Although multi-variate regression analysis is indeed a sophisticated and difficult method of proof in an employment discrimination case,[6] there was additional evidence of specific instances of black and white workers with essentially similar experience and qualifications receiving disparate salaries. Thus, we find that while in some instances the statistical facts spoke for themselves, as in the absence of promotions of black professional workers, in other cases, there was evidence beyond the statistical facts and analysis that would support an inference of discrimination, as in the case of salaries.
 
 
 45
 Having found that the plaintiffs did establish a prima facie case, either on the basis of statistical data by itself or by the use of statistical data and analyses supported by other evidence, the burden fell to the defendants to rebut the plaintiffs' case. Rodriguez v. East Texas Motor Freight, 5 Cir., supra, 505 F.2d at 54. The defendants cannot meet this burden by stating in general terms that no one was denied promotion or comparable salary solely because of his or her race. United States v. Hayes International Corp., 5 Cir., 1972, 456 F.2d 112, 120.
 
 
 46
 The primary justification offered by the appellants for disparities in promotions or salaries was the use of ostensibly nondiscriminatory criteria in decision-making in this area. Some of these criteria were found to be non-discriminatory by the district court: years of experience, technological specialties, technical ability as evidenced by in-service training tests, and academic degree were all appropriate factors for consideration in promotions and for salary awards. The evaluation form urged by defendants as the primary objective factor was found by the district court to be discriminatory, however, as will be discussed later. The court also found that even with regard to the objective, nondiscriminatory factors, there was no consistent application of them in any fixed ratio. A fifth factor, the 'concept of job applied for,' was also found to be subjective and therefore subject to the conscious or unconscious prejudices of the evaluators. See Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348. All of these findings are amply supported by the record.
 
 The Evaluation Form
 
 47
 The primary thrust of appellants' arguments before this court is that the evaluation form devised by them for use in determining promotions and salaries is nondiscriminatory in that the test itself is valid, and according to them, has been validated internally within MCES. The evidence that the test had a racially disproportionate effect shifted the burden of proof to the defendants to show it to be nondiscriminatory. The district court applied the standard of proof established by the regulations implementing title VII to the defendants' evidence. Under the law of this circuit, however, public employment tests are to be judged under a constitutional standard in suits brought under42 U.S.C.A. §§ 1981, 1983. Although a number of other courts have imported wholesale the testing guidelines promulgated by the Equal Employment Opportunity Commission under Title VII,[7] this court in Allen v. City of Mobile, 5 Cir., 1972, 466 F.2d 122, implicitly rejected such a position. See Tyler v. Vickery, 5 Cir., 1975, 517 F.2d 1089, 1097. We do this, recognizing that nonapplication of the Title VII guidelines in a Section 1981 suit against a public employer is now an anachronism, in light of the 1972 amendments to Title VII that extend the coverage of that statute to state and local governments.
 
 
 48
 Although the Title VII guidelines are not applicable here, we do not hold clearly erroneous the finding of the district court that the test was not sufficiently job-related to pass muster under the constitutional standard of Griggs v. Duke Power Company, 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. First, there was ample testimony in support of the court's finding that the questions on the evaluation form were in large part subjective and vulnerable to either conscious or unconscious discrimination by the evaluating supervisors. Cf. United States v. Texas Education Agency, 5 Cir., 1972, 459 F.2d 600, 606. Second, there was evidence to indicate that the evaluation scores themselves were not consistently used as a basis for either promotion or setting salaries. Finally, the evaluation form was used on all employees, regardless of position, such that the defendants wholly failed to make a showing that the test was substantially related to the particular jobs of the individuals being evaluated.
 
 
 49
 Although we have not utilized Title VII guidelines in finding the evaluation form to be discriminatory, we do approve the use of those guidelines in the implementation of relief by the district court. Such a remedy avoids needless relitigation of the testing issue in that any future employment evaluation form would now be subject to the more regorous standards of the Title VII guidelines, on the basis of the 1972 amendments to that Act.
 
 The Individual Plaintiffs
 
 50
 The findings of the court with regard to the individual named plaintiffs Wade and Lindsey were amply supported by the evidence. Any dispute as to the credibility of witnesses asserting nondiscriminatory reasons for the failure to promote Wade and Lindsey was for the trial court to decide. Cf. Bolton v. Murray Envelope Corp., 5 Cir., 1974, 493 F.2d 191, 193--94.
 
 The 1965 Merger
 
 51
 The denial by the appellants that the pre-1965 organization of MCES was discriminatory is without merit. There is ample evidence of this dual system aside from the prior, explicit designation of regular MCES professionals and Negro MCES professionals. This was also exemplified by the separate housing of the staffs of the two services and the different clieenteles served by the black and white workers. The blanket designation of all County Agents as County Leaders, without individual consideration of both the County Agent and Negro County Agent in each locality, also supports this conclusion. Finally, the designation at merger of all Negro County Agents and Negro Home Demonstration Agents as Associate County Agents and Associate Extension Home Economists is prima facie discriminatory. Cf. Lee v. Macon County Board of Education, 5 Cir., 1971, 453 F.2d 1104, 1108--09.
 
 
 52
 The Jurisdiction of the Court over the 4H Clubs
 
 
 53
 The appellants argue that the district court exceeded its jurisdiction in ordering local 4H clubs to cease discriminatory membership practices. The thrust of their argument is that there is insufficient state involvement in the activities of the local clubs themselves to justify the court's order requiring such clubs to implement policies of integration. The difficulty with the argument is that only the MCES was ordered to take action. It is true that the 4H clubs were indirectly required to take action.
 
 
 54
 The approach of the court to commandeer the 4H clubs is tenuous at best. No member of any white segregated 4H club was a party to the suit before the court.[8] It is beyond dispute that for a personal judgment to be binding the court must have personal jurisdiction over the person against whom it is sought to be enforced. To enforce a judgment against a person not before the court clearly violates due process of law. Pennoyer v. Neff, 1878, 95 U.S. (5 Otto) 714, 24 L.Ed. 565.
 
 
 55
 On the other hand, no member of a 4H club has appealed or sought to set aside the order.[9] The Attorney General of Mississippi purports to argue their position although in the same breath it is argued that there is no state support of the clubs and thus no Section 1983 jurisdiction. We hold that the court did not overreach its authority. We construe the order as not purporting to assert jurisdiction over the 4H clubs.[10]Back Pay and Attorney's Fees
 
 
 56
 The district court awarded back pay to individual plaintiffs Wade and Lindsey, and reserved the question of back pay for the class. Attorney's fees were awarded on the basis of the private attorney general exception of the American rule. The court did not consider a number of jurisdictional issues regarding such awards against public agencies and public officials raised by existing and supervening decisions of this and the United States Supreme Court. We must therefore vacate that portion of the district court's judgment awarding back pay and attorney's fees and remand for reconsideration of the following issues.
 
 
 57
 A threshold jurisdictional issue is whether an action under 42 U.S.C.A. § 1983 may be brought against the various state and county corporate defendants, in that such defendants may not be 'persons' under that statute. See Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; City of Kenosha v. Bruno, 1973, 412 U.S 507, 93 S.Ct. 2222, 37 L.Ed.2d 109; Moor v. County of Alameda, 1973, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596. See also, Warner v. Board of Trustees, 5 Cir., No. 75--2303, pending after argument en banc; Muzquiz v. City of San Antonio, 5 Cir., No. 74--3177, pending after argument en banc. A second consideration is whether the various state and county corporate defendants are suable under the provisions of 42 U.S.C.A. § 1981. Compare Arunga v. Weldon, 9 Cir., 1972, 469 F.2d 675; and Black Brothers Combined of City of Richmond v. City of Richmond, E.D.Va., 1974, 386 F.Supp. 147; with Maybanks v. Ingraham, E.D.Pa., 1974, 378 F.Supp. 913, 916.
 
 
 58
 The district court should also consider the status of the various defendants under the Eleventh Amendment. See Edelman v. Jordan, 1974, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662; Hander v. San Jacinto Junior College, 5 Cir., 1975, 519 F.2d 273. See also Adams v. Rankin County Board of Education, 5 Cir., 1975, 524 F.2d 928.
 
 
 59
 Regardless of the court's decision as to the immunity of the various corporate defendants, the court must also consider whether any of the named individuals have the benefit of the qualified immunity given to public officials acting in good faith. Wood v. Strickland, 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214.
 
 
 60
 We not also that the United States Supreme Court has recently granted certiorari in two cases arising under Title VII that involve the award of back pay and attorneys' fees against the state and state officials.[11] Although the result in those cases will not be directly controlling here, in that this suit arises under the provisions of 42 U.S.C.A. §§ 1981, 1983, the court's disposition of the Eleventh Amendment and immunity issues should provide guidance for the district court in its final order. As the Supreme Court in Johnson v. Railway Express Agency stated:
 
 
 61
 We generally conclude, therefore, that the remedies available under Title VII and under Section 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent.
 
 
 62
 421 U.S. 454, at 461, 95 S.Ct. 1716, at 1721, 44 L.Ed.2d 295, at 302.
 
 
 63
 The district court should also reconsider its award of attorney's fees in light of Alyeska Pipeline Service Co. v. Wilderness Society, 1975, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141; Gates v. Collier, 5 Cir., 1975, 522 F.2d 81; Newman v. State of Alabama, 5 Cir., 1975, 522 F.2d 71.
 
 
 64
 The United States argues on appeal that the effect of its intervention in this case under Title IX of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000h--2, was to abrogate the proscription of the Eleventh Amendment against giving retrospective relief to the private plaintiffs. The premise of this argument is that, since the United States can sue the states directly in the public interest, it may assert the claims of the original private plaintiffs as being similarly in the public interest. It argues that implicit in the Title IX legislation is the intent of Congress to obtain this result. The difficulty with this argument is that there is no suggestion in the legislative history that such was the intent of Congress. Rather, the concern of Congressional debate seems to have been the potential breadth of the Attorney General's right to intervene in Civil Rights cases.[12]
 
 
 65
 The statute itself states only that: 'The United States shall be entitled to the same relief as if it had instituted the action.' There is no suggestion that the 'same relief' would be broadened by the presence of private plaintiffs. Before we would read an abrogation of the Eleventh Amendment by Congress into legislation, even assuming that Congress could constitutionally accomplish such an end, we would seek clear evidence of such an intent, such as is present in the 1972 amendments to Title VII.[13] Because we do not find such a clear intent in Title IX or in Sections 1981 or 1983, we need not consider the issue of whether Congress could accomplish such a result.
 
 
 66
 There is one other matter that merits our consideration. This is the realignment of the USDA parties as plaintiffs, following the intervention by the United States Justice Department. Appellants did not raise this point in their briefs to this court, but the matter was considered at some length in oral argument. Were this our final disposition of this case, we would perhaps consider the realignment as a matter affecting the substantial rights of the defendants, in a manner analogous to a finding of plain error in an appeal from a criminal conviction, Rule 52(b), F.R.Crim.P. Because we do vacate and remand for the district court's consideration of the various jurisdictional issues discussed above, we will instead make several comments for the district court's guidance.
 
 
 67
 First, the district court itself noted that the fact this was a class action affected any possible dismissal of parties defendant. Notice was given to the plaintiff classes prior to the realignment, such that those who opted out may have relied, in part, on the presence of the United States as a defendant. Second, it is difficult to see how the interests of one department of the government, which had implicitly or explicitly given support and sanction to the various policies of MCES over the years, could be identical with the interests of another department of the government, which was asserting that those very policies were discriminatory and in violation of the law. There may also be problems of sovereign immunity as well as the need to consider whether the jurisdictional requirement of exhaustion of administrative remedies is necessary.
 
 
 68
 There was no finding by the district court as to the role of USDA and ESUSDA in the discriminatory practices of MCES prior to the realignment. To have allowed USDA to escape any liability without exploring the extent and nature of that role would seem an unwarranted by-product of the Justice Department's intervention. This is particularly so, given the possible imposition of liability for back pay and attorneys' fees.
 
 
 69
 Although the correctness of a realignment of parties is an issue that normally arises only in the context of diversity jurisdiction cases, the principles applicable to those cases are equally so here. The court should determine to which side of the controversy each of the parties to the litigation belongs. The USDA defendants should not have been absolved from liability merely by virtue of the intervention of the Attorney General.
 
 
 70
 Having considered all issues raised by appellants, the judgment of the district court is
 
 
 71
 Affirmed in part, reversed in part, and vacated and remanded in part.
 
 
 
 [1]
 At the time suit was filed, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., was not applicable to state, local or federal government defendants. Plaintiffs have not amended their complaint to allege jurisdiction under Title VII subsequent to the extension of Title VII to such defendants by the 1972 Amendments to that Act
 
 
 [2]
 The classes were as follows:
 (1) All black employees or prospective employees of MCES,
 (2) all black youths who are members of segregated 4H clubs in Mississippi or 4H clubs in the state which practice racial discrimination, and
 (3) all members of segregated home demonstration groups in Mississippi.
 The court did not certify the class represented by Howard Bailey, but allowed him to prosecute his claim individually.
 
 
 [3]
 The private appellees urge that the notice of appeal filed by defendants, which appealed the 'order granting an injunction against the defendants,' thereby limited the scope of the appeal to only the injunctive relief granted by the district court. We find the quoted language to be merely descriptive and find no merit in this contention
 
 
 [4]
 The court found that a third individual plaintiff, Athaniel H. Moody, who had applied in October, 1972, for the position of County Agent in another county, but who had not received it, had not been denied promotion on the basis of racial considerations, given the superior objective qualifications of the white agent who was appointed to the position
 
 
 [5]
 The plaintiffs also asserted that MCES had ceased to operate several 4H summer camps to avoid desegregating such camps. The court found, however, that the discontinuance of camping activities was not motivated by any racially discriminatory purpose and that the termination of camping activities did not have a racially discriminatory result or effect
 
 
 [6]
 See Note, Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal, 89 Harv.L.Rev. 387 (1975)
 
 
 [7]
 See e.g., Boston Chapter NAACP, Inc. v. Beecher, 1 Cir., 1974, 504 F.2d 1017, 1023--26; Vulcan Society v. Civil Service Commission of New York, 2 Cir., 1973, 490 F.2d 387, 394, n. 8; See also, Albermarle Paper Company v. Moody, 1975, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280. We note also this question may be resolved by the Supreme Court in that the Court has granted certiorari in a case out of the District of Columbia circuit applying the Title VII guidelines to a public employment case. Davis v. Washington, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37, 44 U.S.L.W. 3200 (1975)
 
 
 [8]
 Two of the originally named plaintiffs in the suit were members of black, segregated 4H clubs, who would arguably be bound by the judgment of the district court; one of the classes of plaintiffs consisted of members of black 4H clubs. The district court did not, however, designate any class consisting of all 4H club members, nor did it consider whether any of these parties might effectively represent such a class. For all partical purposes, therefore, there were no 4H club members before the court
 
 
 [9]
 The order of the district court provided as follows:
 The defendants shall require each MCES sponsored organization or club (homemaker or 4H) whose membership represents only one race to adopt and implement a written affirmative action plan to take all reasonable steps to eliminate all discrimination in its membership and program practices. Such plan for each club shall specifically contain the assurance that the club does not discriminate in its membership or activities on account of race. Additionally, such plan shall specifically set forth the manner and means by which the nondiscriminatory character of a club's membership and activities has been made known to the local community by available public media such as newspapers, radio, television, etc. MCES shall notify each such organization or club that the failure to adopt and implement such affirmative action will preclude MCES from continued sponsorship. Within six months after this date, defendants shall file a report with the court, and serve a copy thereof upon the parties, setting forth in detail the actions taken to implement the relief ordered in this paragraph and the specific result of those efforts with respect to organizations and clubs under MCES sponsorship.
 
 
 [10]
 The defendants have in fact filed the report referred to in the court's order on August 15, 1974. A large majority of black and white local 4H and homemaker clubs have notified MCES of the adoption and implementation of the referenced affirmative action plan. Such notification followed the publication to each club of a written statement regarding the district court's order, which quoted that part of the order quoted above
 
 
 [11]
 Fitzpatrick v. Bitzer, --- U.S. ---, 96 S.Ct. 561, 46 L.Ed.2d 404 and Bitzer v. Matthews, 44 U.S.L.W. 3358 (1975)
 
 
 [12]
 See e.g., 110 Cong.Rec. 7602 (Remarks of Sen. Stennis)
 
 
 [13]
 See also for example, the Congressional response, 29 U.S.C.A. § 216(b) (Supp. 1976), to the Supreme Court's decision in Employees v. Missouri Public Health Dept., 1973, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251, holding that the extension of the Fair Labor Standards Act to public agencies did not, by itself, abrogate the Eleventh Amendment