Thomas Edward **KINSEY,** Appellant,

v.

**FIRST REGIONAL SECURITIES, INC.,** et al.

**No. 75–1224.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1976.

Decided April 18, 1977.

Chester C. Davenport, Washington, D. C., with whom Willie L. Leftwich, Drew S. Days, III and Roma J. Stewart, Washington, D. C., were on the brief, for appellant. Ronald C. Jessamy, Washington D.C., also entered an appearance for appellant.

C. William Tayler, Washington, D. C., with whom Richard L. Sippel and William J. Donnelly Jr., Washington, D. C., were on the brief, for appellee.

Carol Lynn Green, Atty., Equal Employment Opportunity Commission, Washington, D. C., of the bar of the Supreme

Court of Illinois pro hac vice by special leave of Court, with whom Beatrice Rosenberg and Charles L. Reischel, Attys., Equal Employment Opportunity Commission, Washington, D. C., were on the brief, for the Equal Employment Opportunity Commission as amicus curiae.

Before BAZELON,[*] Chief Judge, TAMM, Circuit Judge, and JUSTICE,[**] United States District Judge for the Eastern District of Texas.

JUSTICE, District Judge:

Plaintiff-appellant instituted this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, seeking redress of alleged employment discrimination by defendant-appellee in its recruitment, testing, and hiring of applicants for the position of securities sales representative. Originally filed as a class action, that aspect of the case was dismissed by the district court,[1] and plaintiff proceeded with his individual claim for damages and injunctive relief. The district judge concluded that plaintiff was not denied employment on the basis of race, and that the aptitude and ability tests utilized by defendant for screening applicants were valid, job-related tests and not a source of employment discrimination.[2] Plaintiff appeals from this decision.

*Facts*

On December 14, 1968, Thomas Edward Kinsey, a black citizen twenty-six years of age,[3] applied for a retail securities sales position with the regional securities investment firm of Legg, Mason & Company, Inc.[4] Kinsey had graduated first in his high school class and was ranked in the top ninety-nine percentile on the Florida High School Examination. He attended Morehouse College in Atlanta, Georgia, an institution for blacks, completing in three years the curriculum for a Bachelor of Science degree and graduating in the top five percent of his college class. He was employed for five years by the Department of the Navy, advancing from a position as staff physicist to supervisory physicist. During the same period of time, he completed course work toward the degree of Ph.D. in physics and took a number of graduate courses in business. This advanced education was financed by the Navy and was made available to individuals considered highly qualified for and recommended by their supervisors. At the time he applied to Legg, Mason, Kinsey was associated as a part-time sales trainee with a mutual funds dealer. While in that employment, he took

---

* Chief Judge Bazelon did not participate in the decision of this case.

** Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The trial judge held that plaintiff failed to meet the Fed.R.Civ.P. 23(a) numerosity and typicality requirements, in view of the small number of putative class members whom plaintiff could appropriately represent as aggrieved by defendant's practices. The court found that the claims and interests of Kinsey were significantly different from those of persons seeking a position other than as retail securities salesman. 60 F.R.D. 91 (D.D.C.1973). Kinsey does not appeal from this decision.

2. Joint App. at 62–63.

3. We correct the numerical error of the trial judge, who found Kinsey was twenty-five years of age at the time, solely because of the signifi-

cance of defendant's requirement that an applicant be at least twenty-four years old.

4. At the time Kinsey applied, defendant was doing business as Mason & Company, Inc., with retail securities sales offices in Washington, D. C., Silver Spring, Maryland, and several cities in Virginia, as well as an institutional sales office in New York. The trial court ruled that the relevant geographic locale was the Washington, D. C., office, which included approximately twenty sales representatives and twenty-two sales trainees, and the Silver Spring office, which employed three sales representatives. Joint App. at 457–59.

On Aug. 1, 1970, Mason & Company, Inc., was dissolved and Legg, Mason & Company, Inc., formed. On Sept. 28, 1973, the corporate name was changed to First Regional Securities, Inc., and on Dec. 23, 1976, it was changed again to Legg Mason Wood Walker, Inc.

the registration examination for the National Association of Securities Dealers (NASD). On December 13, 1968, he was notified that he had passed the examination, and he was duly registered as a securities salesman with NASD.

On December 14, 1968, Kinsey applied to Legg, Mason for employment as a securities salesman. He was interviewed at the Silver Spring, Maryland, office of Legg, Mason by William Gray, the registered representative in charge of that office. Gray administered to Kinsey the Securities Sales Selection Battery (SSSB), a test purporting to measure both an applicant's chances of passing the New York Stock Exchange (NYSE) qualifying examination[5] and his probable first year earnings as a registered securities representative. Kinsey scored a letter grade of "C" on Part A of the SSSB, which purportedly indicated he was an average risk for passing the NYSE examination. He received a score of "C+" on Part B, supposedly indicating he had a forty percent chance of earning $6,000 during his first year as a registered representative on the NYSE. Gray personally assessed Kinsey as intelligent, well-educated, and trainable for the retail sales position.[6]

Kinsey reported back to Gray the following week for the purpose of taking the Klein Battery, an examination comprised of seven individual tests, designed to evaluate aptitude for securities sales work, certain personality traits, and social intelligence. This test data was interpreted by the Klein Institute, which issued a "conditional recommendation" that Kinsey be hired. The Klein reservation was based on a question as to Kinsey's long-term commitment to the non-management position of retail sales representative.[7]

Thereafter, Gray reviewed Kinsey's test results, application form, and resume with H. Grieg Cummings, branch manager of the company's Washington office. Cummings decided, on the basis of the test results, that Kinsey did not meet Legg, Mason's qualifications.[8]

Kinsey did not take another job until June, 1969, when he was employed by Bache & Co., a large securities firm. On December 7, 1969, Kinsey took the examination for registration with the NYSE, receiving a grade of "C." He resigned from Bache & Co., on December 31, 1970, to attend the Harvard Graduate School of Business Administration, where he received the Master of Business Administration degree. Kinsey is presently engaged as a financial consultant.

At the time Kinsey applied to Legg, Mason, the company had allegedly curtailed the hiring of additional sales trainees, in order to concentrate on training recently hired sales personnel. In effect during the period of October 29, 1968, to March 25, 1969, the "moratorium" existed only in the Washington, D. C., area. The company continued to recruit and hire in the Baltimore area. During the curtailment period, the company alleged, its policy was to hire only "exceptional" sales applicants. Legg, Mason's costs incurred in training a securities sales representative for six months and paying a supplemental salary for one year after NYSE registration was from $12,000 to $15,000. Since it took about three years to recover this investment, the company endeavored to hire applicants who demonstrated sales ability, as well as a career desire for securities sales work.

At the trial, testimony was heard from four other black applicants who were denied employment by Legg, Mason.[9] Addi-

---

5. It is noted that passage of the NASD examination was considered a strong indication of success on the NYSE examination.

6. Joint App. at 341, 344a.

7. The test results indicated that Kinsey had a greater aptitude for management level employment than for sales work.

8. Generally, the company required that an applicant be at least twenty-four years of age, have some college education, preferably a degree, have prior sales experience or business background, and demonstrate desire for a long-term commitment to securities sales.

9. Harold Jones, a black male with a B.A. degree in business administration, applied to Legg,

tionally, Kinsey showed that eight white applicants were hired during or following the moratorium.

Of the white individuals who made application and were hired during the period in question, some were not required to take and pass the SSSB as a prerequisite of employment, even though they had not previously taken the National Association of Securities Dealers examination. (The NASD examination was regarded as the equivalent of the SSSB, with respect to predicting success on the NYSE examination.) At trial, Legg, Mason showed that the administrative processing of three of the applications had commenced prior to imposition of the moratorium. Four of the whites applied during the moratorium and were hired after it ceased to be in effect. Legg, Mason testified that the one individual who applied and was hired as a sales trainee during the curtailment period was an "exceptionally well qualified" applicant. This employee was a sales representative with IBM and had sold mutual funds for six months; like Kinsey, he was previously reg-

istered with the NASD and was conditionally recommended by the Klein Institute.

### Prima Facie Case

The district court found that, although plaintiff demonstrated the requisite educational qualifications for a securities sales position, defendant entertained actual reservations as to Kinsey's motivation to make a career of selling securities, on the basis of the test results. The court below concluded, therefore, that Legg, Mason had a valid business reason for refusing to employ Kinsey in a period of curtailment, during which the company's policy was to concentrate on training its existing sales personnel and to hire only "exceptionally qualified and motivated" applicants.[10]

Appellant challenges the trial court's conclusion here on the grounds that the court erred in not finding that he had established a prima facie case of racial discrimination, and that appellee's avowed reasons for refusal to hire were merely pretextual. In addressing these contentions, we are governed by the "clearly erroneous" test of Fed.R.Civ.P. 52(a) in reviewing the district court's findings of fact.[11] The Fifth

Mason in August, 1968, when the company was actively recruiting. A sales representative for Xerox Corporation and a licensed real estate broker, Jones was administered the SSSB and received a "D+" on Part A and a "C−" on Part B, which represented he was a poor risk for passing the NYSE examination and had a twenty-five percent chance of making $6,000, as his first year earnings in securities sales. He was subsequently told he had not scored sufficiently well to be considered for employment.

Also in August, 1968, James White, III, a black male with a B.A. degree from Rutgers University and two years' service in the Presidential Honor Guard, applied to Legg, Mason. White's sales-related experience consisted of having sold food freezer plans while in college; he also had engaged in fund-raising and public relations, as a professional staff member of the Boy Scouts of America. White was administered the SSSB, scoring "C+" on Part A and "C−" on Part B. White's employment counsellor testified that Legg, Mason's assistant branch manager, Joseph Smith, who interviewed White, informed her that White would not be offered employment, because of the company's racial policy. Smith denied making the statement but admitted his personal reservations about a black's possibility for success

in the securities sales business. Joint App. at 446.

Joyce Booker, a twenty-one year old black woman with a degree in business administration, applied in early October, 1968, at a job fair held by Legg, Mason, for the purpose of interviewing prospective sales representative applicants. After completing an employment application, Ms. Booker had a brief interview with a Legg, Mason staff member. She had no further communication with the company.

In late 1969 or early 1970, Samuel Keys, a black male with some college education, applied to Legg, Mason, in order to relocate from New York City. He was employed there in the mutual funds operations department of a corresponding firm for Legg, Mason. Keys was interviewed and told that the company was not hiring at the time. He was never notified of any available position.

10. Joint App. at 62.

11. Under this doctrine,
   [a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Circuit has aptly analyzed the scope of the reviewing court's determinations in this area:

> Although discrimination *vel non* is essentially a question of fact it is, at the same time, the ultimate issue for resolution . . . . As such, a finding of discrimination or non-discrimination is a finding of ultimate fact. [Citations omitted.] In reviewing the district court's findings, therefore, we will proceed to make an independent determination of appellant's allegations of discrimination, though bound by findings of subsidiary fact which are themselves not clearly erroneous. Also . . . we must determine whether there are requisite subsidiary facts to undergird the ultimate facts.

*Causey v. Ford Motor Co.*, 516 F.2d 416, 420 (5th Cir., 1975); *See also Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508, 516 (5th Cir. 1976). In this manner, we now direct our attention to the claim before us, to ascertain whether under applicable law the district court was correct in its findings of nondiscrimination.

■ The requirements for establishing a prima facie case of racial discrimination were enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff's initial burden under Title VII is to show:

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. Once the plaintiff establishes the above elements, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's rejection. However, the inquiry must not end there. Plaintiff may rebut by showing that defendant's stated reason for rejection was in fact pretext. *Id.*

■ Legg, Mason's general qualifications for an applicant seeking a securities sales position were four:

(1) minimum age of twenty-four;

(2) college education, preferably a degree;

(3) prior sales experience or business background; and

(4) long-term commitment to securities sales.[12]

There is no dispute as to Kinsey's meeting the first two requisites. In support of its argument that Kinsey was not qualified for employment, Legg, Mason asserts that Kinsey lacked sales experience[13] and further relies on the results of the Klein Battery,[14] which reported reservations as to Kinsey's career interest in sales work. Whether this argument amounts to a valid business reason or whether it is a mere pretext for refusal to hire is the issue to be resolved.

The "business necessity" justification for employment practices having a discriminatory impact was recognized in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Delineating the remedial purposes of Congress in enacting Title VII of the Civil Rights Act of 1964, the Supreme Court stated:

> [Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

**12.** Joint App. at 332.

**13.** Kinsey's actual sales experience consisted of part-time retail clothing sales during high school and training in sales of mutual funds.

**14.** The validity of the test is discussed, *infra*.

401 U.S. 431, 91 S.Ct. 853. Legg, Mason asserts that, on the basis of business necessity, it decided not to invest in the training of Kinsey, who lacked sales experience and sales motivation. Appellee relies on *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972), in support of its position. In that case, the court noted that 500 hours flight time was a reasonable minimum requirement, to ensure that applicants passed the rigorous flight officer training program. The court further stated that:

> When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminates against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related.

*Id.* at 219.

We cannot earnestly compare the training program of a securities sales representative with that of a flight officer who ultimately is responsible for the safety of passengers as well as costly aircraft. In the latter, public interest is paramount and justifies high employment standards. The cost of Legg, Mason's securities sales representative training program is not the economic risk that was the concern of the court in *Spurlock.* Other courts have held that an employment policy that perpetuates the vestiges of discrimination can be justified only by "an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.), *cert. dism'd,* 404 U.S. 1006, 1007, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *see also United States v. N. L. Industries, Inc.*, 479 F.2d 354, 365 (8th Cir. 1973); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 249 (10th Cir.), *cert. denied,* 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); *Local 189, United Papermakers and Paperworkers v. United States*, 416 F.2d 980, 989 (5th Cir. 1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). In light of this authority, the investment cost in training its salesmen cannot sufficiently justify Legg, Mason's application of criteria which operate to freeze the status quo of an historical preference for whites in the profession.[15]

Appellee's argument that it relied on objective criteria is particularly suspect, since these criteria were not applied alike to all applicants. The record discloses that as to several of the white applicants who were hired during the moratorium or shortly thereafter, Legg, Mason waived one or two of its requirements. In fact, it appears that the company hired some white applicants who had qualifications inferior to Kinsey's.[16] As exhibited here, such non-uniform and unequal application of criteria by an employer constitutes an unfair employment practice. *See Wade v. Mississippi Cooperative Extension Service, supra; Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721 (8th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972).

A careful examination of the record leads us reasonably to conclude that Legg, Mason's avowed moratorium on hiring served as a pretext to exclude Kinsey, who otherwise was qualified for the position

---

**15.** See text, *infra. See also Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**16.** As to two newly-hired employees, defendant waived a college degree; prior sales experience was waived in three instances; and five of those hired were not required to take the Securities Sales Selection Battery as a prerequisite of employment, even though they were not previously registered with the National Association of Securities Dealers.

sought. Legg, Mason has failed to articulate an overriding business concern that would sufficiently justify the discriminatory effect of its employment practices. Thus, under the *McDonnell Douglas* test, appellant has established a prima facie case on the basis of Legg, Mason's objective criteria alone. However, our determination does not end here; his prima facie case is also susceptible of support by an inquiry into the challenged subjective hiring procedures of appellee.

Appellant and the Equal Employment Opportunity Commission, as *amicus curiae,* attack the word of mouth recruiting by the company's securities salesmen and the referral of applicants by all-white sales managerial personnel, as being subjective in nature and discriminatory against blacks.

■ Legg, Mason admitted that, up to the time of trial, the company had never employed a black securities sales representative.[17] An employer's contentions that a black applicant was not hired because he was not qualified will be closely scrutinized, where the number of blacks within the defendant's workforce is non-existent or, at best, extremely nominal. *See United States v. N. L. Industries, supra* at 370–71.

In this respect, the record indicates that Legg, Mason's retail securities salesmen primarily produced commission income for the company. Legg, Mason required that its salesmen have the initiative to solicit and build their clientele, and gain the confidence of prospective clients by exuding integrity, reliability and long-term service.[18] During the trial, the company's assistant

manager and occasional initial interviewer, J. J. Smith, testified as to his personal reservations regarding the success of a black securities salesman.[19] It was further testified that the company encouraged word-of-mouth recruiting by the incumbent sales force.[20] In fact, one of the white applicants, who had no prior sales experience and who was hired shortly after the moratorium, was referred by a Legg, Mason employee.

■ Although Legg, Mason had instituted an affirmative minority recruitment policy in 1968 (four years after the effective date of the Civil Rights Act), realization of that policy is not readily discernible. Rather, the record reflects that appellee's practices fell short of affirmative action. An employer in a profession which traditionally has been white may unknowingly gauge a minority group applicant against the white stereotype, and conclude that he lacks the intangible qualities indicative of professional aptitude and competence.[21] Furthermore, a policy of referral by incumbent all-white employees may be discriminatory, because of its tendency to perpetuate the homogeneous composition of the work force. *Barnett v. W. T. Grant Co.,* 518 F.2d 543, 549 (4th Cir. 1975); *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir. 1972); *Brown v. Gaston County Dyeing Machine Co., supra* at 1383. The employer's good faith will not absolve him of discriminatory hiring practices, where, in fact, the consequences of his employment procedures are the perpetuation of a disparate racial impact.[22] *Griggs v. Duke Power Co., supra*

17. Joint App. at 305.

18. Joint App. at 307–08.

19. Smith was concerned that a black stockbroker would not foster black clientele, because of asserted black customer preference for a white stockbroker. Joint App. at 446, 451–52.

20. Joint App. at 306.

21. For a discussion of some of the problems encountered by racial minorities and women in this respect, *see* Stacy, *Subjective Criteria in Employment Decisions Under Title VII,* 10 Ga. L.Rev. 737 (1976), and Note, *Title VII and Em-*

*ployment Discrimination in "Upper Level" Jobs,* 73 Colum.L.Rev. 1614 (1973).

22. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the court held that a racially disproportionate impact is a violation of equal protection, however, only where a discriminatory purpose is shown. Since plaintiff-appellant here proceeds under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* and 42 U.S.C. § 1981, he need not meet this burden of proof. *See League v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976) *and The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 58, 114–23 (1976) for discussion of the *Washington v. Davis* decision.

401 U.S. at 432, 91 S.Ct. 849; *see United States v. N. L. Industries, supra* at 361; *Marquez v. Omaha District Sales Office, Ford Division,* 440 F.2d 1157, 1161 (8th Cir. 1971).

Finally, appellant argues that his efforts to develop a prima facie case were improperly constrained by the trial court's exclusion of proffered expert testimony regarding appellee's hiring practices from 1965 to 1972. The evidence was rejected on two grounds: (1) it was based on facts outside the six-month period which the district judge ruled should circumscribe the trial proceedings,[23] and (2) it included hiring practices in those offices of defendant located outside the District of Columbia metropolitan area.[24] Similarly, appellant's proffer of statistical evidence allegedly tending to show the disparate proportion of qualified blacks in the geographic areas in which appellee recruited to the number of sales personnel employed by it was denied admission into evidence.

The district court's exclusion of the evidence of hiring practices and statistical data was erroneous. It is well established that statistical evidence demonstrating a racially disproportionate impact of employment practices may be used to buttress a prima facie case of racial discrimination. *See McDonnell Douglas v. Green, supra* 411 U.S. at 802, 93 S.Ct. 1817; *Barnett v. W. T. Grant Co., supra* at 549; *Brown v. Gaston County Dyeing Machine Co., supra* at 1382; *Senter v. General Motors Corp.,* 532 F.2d 511, 527 (6th Cir. 1976); *United States v. Hazlewood School District,* 534 F.2d 805, 810–11 (8th Cir. 1976). It has

been further held that statistical disparity between the proportion of blacks in the employer's work force and the proportion of blacks in the relevant labor market constitutes a prima facie case of discrimination in violation of Title VII. *See Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 426 (8th Cir. 1970); *Carter v. Gallagher,* 452 F.2d 315, 323 (8th Cir. 1971), *modified on rehearing, en banc,* 452 F.2d 327, *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Jones v. Lee Way Motor Freight, supra* at 247; *Rodriquez v. East Texas Motor Freight,* 505 F.2d 40, 53–54 (5th Cir. 1974), *cert. granted,* 425 U.S. 990, 96 S.Ct. 2200, 48 L.Ed.2d 814 (1975).

Such evidence is equally valid in an upper level job discrimination case, provided the relevant labor pool is accurately defined, as to those persons possessing the qualifications which the employer requires. The district court's attempt to facilitate the trial proceedings by limiting evidence to the appellee's activities in the metropolitan District of Columbia geographic boundary and to the six month time-frame was an unnecessary constriction. An individual claim, as opposed to a class action, does not alter the probative value of an employer's practices, policies or patterns, relative to a determination of whether racial discrimination existed in a specific case. Particularly appropriate for consideration by the factfinder was evidence of Legg, Mason's employment practices in relation to the qualified labor market after 1964, the effective date of the Civil Rights Act.[25] The instructive language of *Griggs* approves no less than this.[26]

---

**23.** The trial judge ruled the relevant evidentiary time period was the six months during which the alleged moratorium on hiring was in effect. Joint App. at 39.

**24.** The trial judge limited the relevant geographic locale to defendant's main office in Washington, D. C., and the branch office in Silver Spring, Maryland. Defendant's offices in the Virginia area were excluded. Joint App. at 457–59. See note 4, *supra.*

**25.** Of significant support here is the Fifth Circuit's approval of a trial judge's reliance on statistical data establishing discrimination in

the staffing of the professional positions of county agricultural agent and home demonstration agent. Of eighty-seven persons appointed to these positions between the years 1965 and 1970, none were black although there were available, qualified black candidates. *Wade v. Mississippi Coop. Extension Serv.,* 528 F.2d 508, 517 (5th Cir. 1976).

**26.** The Supreme Court has interpreted Title VII in the following light:

[P]ractices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to

**840**

*Validity of Tests*

In view of our disposition of the issue concerning appellant's prima facie case, we find it unnecessary to reach his second point, attacking the validity of the aptitude and ability tests utilized in screening job applicants. Moreover, the possible changes in this area of the law occasioned by recent decisions of the Supreme Court [27] and lower federal courts [28] may require that new evidentiary matters be developed and considered during the retrial of this action.

Reversed and remanded.

"freeze" the status quo of prior discriminatory employment practices. *Griggs v. Duke Power Co., supra*, 401 U.S. at 430, 91 S.Ct. at 853.

**27.** *Washington v. Davis, supra; see also The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 58, 114–23 (1976).

**28.** *United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977); *League v. City of Santa Ana, supra.*